JOHN J. LACE, Assignee *vs.* CLARENCE A. SMITH *et als.*

MARCH 5, 1912.

PRESENT: Dubois, C. J., Johnson, Parkhurst, and Sweetland, JJ.

*(1)   Constitutional Law.   Bankrupt and Insolvent Laws.*

Under the provisions of Cons. U. S., Art. I, § 8, "The congress shall have power:—to establish uniform laws on the subject of bankruptcies, throughout the United States," this power when exercised and to the extent that it is exercised, is exclusive. However it is not the mere existence of this power, but its exercise, which is incompatible with the exercise of the same power by the states. It is not the right to establish these uniform laws, but their actual establishment which is inconsistent with the partial acts of the states.

*(2)   Conflict of Laws.   Bankrupt and Insolvent Laws.*

A state has authority to enact bankrupt or insolvent laws that do not conflict with Federal bankrupt laws then in force.

*(3)   Conflict of Laws.   Bankrupt and Insolvent Laws.*

Gen. Laws, 1909, cap. 339 "Of proceedings in insolvency," is not in conflict with the national bankrupt act of 1898, for though the bankrupt act suspends the operation of any state insolvent law where there is any conflict between the two, the state law remains in full force in so far as there is no conflict, and as the bankrupt act expressly exempts from its involuntary proceedings, wage earners and farmers, the power of the state exists over such cases.

*(4)   Constitutional Law.   Bankrupt and Insolvent Laws.*

Gen. Laws, 1909, cap. 339 "Of proceedings in insolvency," is not in conflict with U. S. Cons. Art. I, § 10, and R. I. Cons. Art. I, § 12, in that it impairs the obligations of contracts or is retroactive, for as to any contract made after its passage, the act entered into such contract as part of the existing law, and as to an ordinary open account between attorney and client for services which commenced prior to the passage of the act the obligation of

the contract remains unimpaired, although its value may have been impaired by the neglect of the attorney to use due diligence in the collection of his charges.

(5)  *Same.*

Gen. Laws, 1909, cap. 339 "Of proceedings in insolvency," is not in conflict with U. S. Cons. Art. XIV of amendments, or R. I. Cons. Art. I, § 10, as depriving a person of property without jury trial and due process of law, since in a bill in equity brought by an assignee in involuntary insolvency, to recover property alleged to have been conveyed in fraud of creditors, a jury trial may be had upon issues of fact, while such a proceeding is one well recognized as appropriate for that purpose in the law of the land.

BILL IN EQUITY on facts stated in opinion.   Certified on constitutional questions.

DUBOIS, C. J.   This is a bill in equity brought in the Superior Court by the complainant as assignee, in involuntary insolvency, of Clarence A. Smith aforesaid; a person engaged chiefly in farming, or the tillage of the soil.   The complainant therein alleges that said Smith on the 29th and 30th days of September, 1909, being insolvent and acting in contemplation of insolvency, and with the intent to hinder, delay and defraud his creditors, conveyed and transferred certain real and personal property to the respondent Mowry who knew, or had reasonable cause to believe, that said Smith was so insolvent and acting in contemplation of insolvency, with intent to hinder, delay and defraud his creditors.   The complainant prays that said conveyances and transfers be adjudged invalid; that said Smith and Mowry may be ordered to convey said property to him, and that they be required to account for their use and occupation of said real estate.   The respondents severally have made answer to the bill and said Mowry has brought in question upon the record the constitutionality of Gen. Laws, 1909, cap. 339, entitled "Of proceedings in insolvency," whereunder the complainant derived his appointment and qualification as assignee as aforesaid, and the constitutional questions thus raised have been duly certified to this court for hearing and determination.

The constitutional provisions which the respondent asserts have been violated by the chapter in question are the following: United States Constitution, Art. I, Section 10: "No state shall . . . pass any bill of attainder, *ex post facto* law, or law impairing the obligation of contracts;" Amendments to the United States Constitution, Art. XIV: "No state shall make or enforce any law which shall . . . nor shall any state deprive any person of life, liberty or property without due process of law;" Constitution of Rhode Island, Art. I, Section 10: "No person shall be deprived of life, liberty or property unless by the judgment of his peers, or the law of the land;" and Section 12 thereof: "No *ex post facto* law, or law impairing the obligation of contracts shall be passed."

Shortly after the entry of the case in this court the respondent Mowry filed the following motion to dismiss the same:

"PROVIDENCE, SC.                    SUPREME COURT.

JOHN J. LACE, JR., Assignee      ⎫
            vs.                    ⎬   Constitutional question
CLARENCE A. SMITH, *et al.*      ⎭        No. 440.

"In the above entitled case, wherein said John J. Lace Jr. brings his bill of complaint against Clarence A. Smith et al in his pretended capacity of assignee to set aside certain conveyance of real estate &c mentioned in his said bill of complaint, made by said Smith deft. to deft. Marquis D. L. Mowry and therein in his said bill of complaint pretending to be assignee in insolvency of said deft. Clarence A. Smith in a pretended petition filed in the Superior Court for Bristol and Providence Counties on to wit: the 21st day of January A. D. 1910, under the provisions of cap. 339 of the General Laws of Rhode Island, wherein he alleges said Clarence A. Smith was insolvent, and duly adjudged insolvent on to wit: the 20th day of June A. D. 1910, said complainant alleges and pretends he was duly appointed and qualified as such assignee of the estate of said Clarence A. Smith insolvent; on the petition of certain creditors of said Clarence

A. Smith deft. to wit: on the petition of James N. Smith executor of the will of Hope T. Williams deceased &c.

"The defendant M. D. L. Mowry moves that said bill of complaint and all the proceedings thereunder and that said Insolvent petition and all the proceedings therein be dismissed from and out of this court and said Superior Court for the following reasons.

"1st.    That said Clarence A. Smith was at the time said Petition on to wit: the 21st day of January 1910 filed in said Superior Court against him then was and now is owing debts to the amount of one thousand dollars and more, and avers that he then owed and now owes more than three thousand dollars.

"2d.    That said cap. 339 of the General Laws of Rhode Island *is null and void* being in conflict with 'An act to establish a uniform system of bankruptcy throughout the United States approved July 1, A. D. 1898," and the amendments thereof, which act now is and has been in full force and effect ever since its enactment.

"3d.    That said cap. 339 and the provisions thereof, act upon the same subject matter and the same persons as the said United States Bankrupt Law, therefore null and void.

"4th.    The two Statutes have the same general object, to wit: to discharge and release the debts of the Bankrupt and Insolvent, and act upon the same persons and the same causes (with some exceptions, and this case does not come within the exception) by similar modes and different jurisdictions the object of both statutes is to discharge an insolvent or bankrupt from his debts, on complying with the provisions of the said statutes, and they are in conflict with each other in their operation and provisions, Wherefore said Insolvent Law cap. 339 is null and void.

MARQUIS D. L. MOWRY for himself."

The motion to dismiss raises a jurisdictional question by attacking the foundation, not only of the bill in equity, but also of the proceedings in insolvency upon which the bill is

based. If the motion should be granted, the whole case including the constitutional questions raised therein, would terminate and cease to exist, therefore it becomes necessary to first inquire into the validity of the motion. The insolvent law in question originated May 26, 1908, when it was passed by the legislature as cap. 1577 of the public laws, nearly ten years after the passage of the Federal Bankruptcy act. Under the provisions of the United States Constitution, Art. I, sec. 8: "The congress shall have power:—To establish . . . uniform laws on the subject of bankruptcies, throughout the United States." That this power when exercised, and to the extent that it is exercised, is exclusive upon the subject cannot be successfully denied. Almost a century ago, in the case of *Sturges* v.*Crowninshield*, 4 Wheat. 122, it was determined that the power so granted to congress, is unlimited and supreme, but not exclusive. In the course of his opinion Chief Justice Marshall, said, p. 192: "In considering this question, it must be recollected, that previous to the formation of the new constitution, we were divided into independent states, united for some purposes, but in most respects, sovereign. These states could exercise almost every legislative power, and among others, that of passing bankrupt laws. When the American people created a national legislature, with certain enumerated powers, it was neither necessary nor proper to define the powers retained by the states. These powers proceed, not from the people of America, but from the people of the several states; and remain, after the adoption of the constitution, what they were before, except so far as they may be abridged by that instrument. In some instances, as in making treaties, we find an express prohibition; and this shows the sense of the convention to have been, that the mere grant of a power to congress, did not imply a prohibition on the states to exercise the same power. But it has never been supposed, that this concurrent power of legislation extended to every possible case in which its exercise by the states has not been expressly prohibited. The confusion resulting

from such a practice would be endless. The principle laid down by the counsel for the plaintiff, in this respect, is undoubtedly correct. Whenever the terms in which a power is granted to congress, or the nature of the power, require that it should be exercised exclusively by congress, the subject is as completely taken from the state legislatures, as if they had been expressly forbidden to act on it.

"Is the power to establish uniform laws on the subject of bankruptcies, throughout the United States, of this description? The peculiar terms of the grant certainly deserve notice. Congress is not authorized merely to pass laws, the operation of which shall be uniform, but to establish uniform laws on the subject throughout the United States. This establishment of uniformity is, perhaps, incompatible with state legislation, on that part of the subject to which the acts of congress may extend. But the subject is divisible in its nature into bankrupt and insolvent laws; though the line of partition between them is not so distinctly marked as to enable any person to say, with positive precision, what belongs exclusively to the one, and not to the other class of laws. It is said, for example, that laws which merely liberate the person are insolvent laws, and those which discharge the contract, are bankrupt laws. But if an act of congress should discharge the person of the bankrupt, and leave his future acquisitions liable to his creditors, we should feel much hesitation in saying, that this was an insolvent, not a bankrupt act; and therefore, unconstitutional. Another distinction has been stated, and has been uniformly observed. Insolvent laws operate at the instance of an imprisoned debtor; bankrupt laws at the instance of a creditor. But should an act of congress authorize a commission of bankruptcy to issue on the application of a debtor, a court would scarcely be warranted in saying, that this was unconstitutional, and the commission a nullity.

"When the laws of each description may be passed by the same legislature, it is unnecessary to draw a precise line between them. The difficulty can arise only in our complex system, where the legislature of the Union possesses the

power of enacting bankrupt laws; and those of the states, the power of enacting insolvent laws. If it be determined, that they are not laws of the same character, but are as distinct as bankrupt laws and laws which regulate the coures of descents, a distinct line of separation must be drawn, and the power of each government marked with precision. But all perceive that this line must be, in a great degree, arbitrary. Although the two systems have existed apart from each other, there is such a connection between them as to render it difficult to say how far they may be blended together. The bankrupt law is said to grow out of the exigencies of commerce, and to be applicable solely to traders; but it is not easy to say, who must be excluded from, or may be included within, this description. It is, like every other part of the subject, one on which the legislatures may exercise an extensive discretion.

"This difficulty of discriminating with any accuracy between insolvent and bankrupt laws, would lead to the opinion that a bankrupt law may contain those regulations which are generally found in insolvent laws; and that an insolvent law may contain those which are common to a bankrupt law. If this be correct, it is obvious, that much inconvenience would result from that construction of the constitution, which should deny to the state legislature the power of acting on this subject, in consequence of the grant to congress. It may be thought more convenient, that much of it should be regulated by state legislation, and congress may purposely omit to provide for many cases to which their power extends. It does not appear to be a violent construction of the constitution, and is certainly a convenient one, to consider the power of the states as existing over such cases as the laws of the Union may not reach. But be this as it may, the power granted to congress may be exercised or declined, as the wisdom of that body shall decide. If, in the opinion of congress, uniform laws concerning bankruptcies ought not to be established, it does not follow, that partial laws may not exist, or that state legislation on the subject must cease. It is not the mere existence

of the power, but its exercise, which is incompatible with the exercise of the same power by the states. It is not the right to establish these uniform laws, but their actual establishment, which is inconsistent with the partial acts of the states.

"It has been said, that congress has exercised this power: and by doing so, has extinguished the power of the states, which cannot be revived by repealing the law of congress. We do not think so. If the right of the states to pass a bankrupt law is not taken away by the mere grant of that power to congress, it cannot be extinguished; it can only be suspended, by the enactment of a general bankrupt law. The repeal of that law cannot, it is true, confer the power on the states; but it removes a disability to its exercise, which was created by the act of congress. Without entering farther into the delicate inquiry respecting the precise limitations which the several grants of power to congress contained in the constitution, may impose on the state legislatures than is necessary for the decision of the question before the court, it is sufficient to say, that until the power to pass uniform laws, on the subject of bankruptcies be exercised by congress, the states are not forbidden to pass a bankrupt law, provided it contains no principle which violates the 10th section of the first article of the constitution of the United States."

Subsequently, in the case of *Ogden* v. *Saunders*, 12 Wheat. 213, it was held that the power of congress "to establish uniform laws on the subject of bankruptcies throughout the United States," does not exclude the right of the states to legislate on the same subject, except when the power is actually exercised by congress, and the state laws conflict with those of congress. As was said in that case by Thompson, J., at p. 312: "Such law, in its principle and object, has in view the benefit of both debtor and creditor, and is no more than the just exercise of the sovereign legislative power of the government, to relieve a debtor from his contracts, when necessity, and unforeseen misfortunes, have rendered him incapable of performing them; and whether this power is to be exercised by the states individually, or by the United States, can make no difference in principle, in a government

like ours, where sovereignty, to a modified extent, exists both in the states, and in the United States. It was, in the formation of the constitution, a mere question of policy and expediency, where this power should be exercised; and there can be no question, but that, so far as respects a bankrupt law, properly speaking, the power ought to be exercised by the general government. It is naturally connected with commerce, and should be uniform throughout the United States. A bankrupt system deals with commercial men, but this affords no reason why a state should not exercise its sovereign power, in relieving the necessities of men who do not fall within the class of traders, and who, from like misfortune, have become incapable of performing their contracts.

"Without questioning the constitutional power of congress to extend a bankrupt law to all classes of debtors, the expediency of such a measure may well be doubted. There is not the same necessity of uniformity of system, as to other classes than traders; their dealings are generally local, and different considerations of policy may influence different states on this subject; and should congress pass a bankrupt law confined to traders, it would still leave the insolvent law of New York in force as to other classes of debtors, subject to such alteration as that state shall deem expedient."

In this connection the following language employed by Mr. Justice Clifford in the opinion of the court, delivered in the case of *Baldwin* v. *Hale*, 1 Wall. 223, at p. 228, is illuminating: "Controversies involving the constitutional effect and operation of State insolvent laws have frequently been under consideration in this court, and unless it be claimed that constitutional questions must always remain open, it must be conceded, we think, that there are some things connected with the general subject that ought to be regarded as settled and forever closed.

"State legislatures have authority to pass a bankrupt or insolvent law, provided there be no act of Congress in force establishing a uniform system of bankruptcy, conflicting with such law; and, provided the law itself be so framed

that it does not impair the obligation of contracts. Such was the decision of this court in *Sturges* v. *Crowinshield*, 4 Wheat. 122, and the authority of that decision has never been successfully questioned."

As early as the year eighteen hundred congress recognized the authority of the states in the premises for in Section 61 of the bankruptcy law, passed in that year, they made the following provision: "This act shall not repeal or annul or be considered to repeal or annul, the laws of any state now in force, or which may be hereafter enacted, for the relief of insolvent debtors, except so far as the same may affect persons who are or may be within the purview of this act." Similar provisions have been omitted from all subsequent bankruptcy statutes, doubtless on account of the decisions of the Supreme Court rendered in the cases of *Sturges* v. *Crowninshield* and *Ogden* v. *Saunders, supra.* As there is no longer doubt of the authority of the state legislature to enact bankrupt or insolvent laws that do not conflict with Federal bankrupt laws then in force, the question for determination therefore resolves itself into this : Do the provisions of Gen. Laws, 1909, cap. 339, conflict with those of U. S. Statutes at Large, cap. 541, passed July 1, 1898, and its amendments and additions in their application to the case under consideration.

(2) The reasons urged in the third and fourth grounds of the motion to dismiss respectively are: that the State and Federal statutes act upon the same subject matter and the same persons, and upon the same persons and the same causes (with some exceptions, which do not include this case). Under said cap. 339, sec. 12: "Any inhabitant of this State owing debts in this state to the amount of three hundred dollars or more, and who shall be insolvent, may prefer his voluntary petition under oath for relief as an insolvent." And under the provisions of Section 21 of the same statute: "One or more creditors holding in the aggregate claims not less than one-fourth in amount of all the debts as they appear at the time of adjudication of insolvency, may prefer a petition in insolvency against a debtor." It thus

appears that under the State statute the initial step to secure the benefit of its provisions may be taken either by the insolvent debtor, or by his creditors.

Under the provisions of the Federal law, Sec. 4, a: "Any person who owes debts, except a corporation, shall be entitled to the benefits of this act as a voluntary bankrupt." And under said sec. 4, b, with certain exceptions, any natural person, and certain corporations, owing debts to the amount of one thousand dollars or over, may be adjudged an involuntary bankrupt upon default or an impartial trial, and shall be subject to the provisions and entitled to the benefits of the act. The exceptions alluded to comprise wage earners and persons engaged chiefly in farming, or the tillage of the soil. It is manifest therefrom that the respondent Clarence A. Smith, being a person engaged chiefly in farming or the tillage of the soil, is expressly excepted and exempted from the involuntary provisions of the bankruptcy act. As a person, said respondent is entitled to the benefits of the act if he seeks them as a voluntary bankrupt, but he cannot be forced into involuntary bankruptcy because he is a farmer. If the State and Federal statutes conflict it must be because the former may be applied to a person included within the terms of the latter. However, no such conflict has arisen in this case. Clarence A. Smith, who is entitled to apply for the benefit of the bankruptcy act, did not make application for relief as an insolvent under the state statute. Neither is there in this case any conflict of jurisdiction between the State and United States courts. Up to the present time the State courts have taken jurisdiction of the parties and subject matter of the litigation, and, for aught that appears, nothing has been done in the way of invoking the jurisdiction of the courts of the United States in the premises. But the argument that State statutes must not be applied to persons who may be entitled to relief under the Federal law takes too narrow a view of the subject. To repeat the language of Chief Justice Marshall: "It does not appear to be a violent construction of the constitution, and is certainly a convenient one, to consider the power of the states as existing over

such cases as the laws of the union may not reach." *Cases* and not *persons* alone should be the test. Tried by this test, does the bankruptcy act provide for the involuntary bankruptcy of wage earners or farmers? It not only does not, but specially exempts them from its provisions. Therefore the power of the state may be considered as existing over such cases.

We are aware that these views are not in harmony with those expressed by some of the eminent jurists in other states, as for example, in the language of Knowlton, J., in *Parmenter Manuf. Co.* v. *Hamilton,* 172 Mass. at p. 180: "We are of opinion that the language (of the U. S. Bankruptcy law passed on July 1, 1898), was chosen to make clear the purpose of Congress that the new system of bankruptcy should supersede all State laws in regard to insolvency from the date of the passage of the statute." And in that of Strout, J., in *Littlefield* v. *Gay,* 96 Me. 422: "Under the Bankrupt law, Blackington could have gone into bankruptcy voluntarily, but could not be forced in by his creditors under involuntary proceedings. He was asked to go in and refused. It was argued with great ability that in that condition the State insolvency law may be invoked. Plausible as the argument is, we do not regard it as sound. At any time after proceedings under the State law, Blackington could have voluntarily invoked the Bankrupt Law, and thereupon all proceedings under the State law would necessarily cease. The test of jurisdiction under the State law does not rest upon the volition of the debtor. If his person and property are or may be subject to the Bankrupt Law, then as to him and his possessions the State insolvency law is in abeyance and powerless. Upon any other view, it would be in the power of the debtor at any time to oust the jurisdiction of the State court after it had been assumed. This would result in great confusion. It may be avoided by holding, as we do, that where the person falls within the purview of the Bankrupt Act, whether by voluntary or involuntary proceedings, the State insolvency law must be silent." Also in that of Spear, J., in *Moody* v. *Development Co.* 102 Me. 384: "Our conclusion

is that Chapter 85 of the laws of 1905, with respect to the clauses herein considered is in effect an insolvent law and is suspended and superseded by the National Bankrupt Act of 1898, as to all insolvent corporations, whose property may be subject, by either voluntary or involuntary proceedings. to the authority and jurisdiction of said act" and, "We deem it unnecessary to discuss the possible suggestion that the Act of 1905 was passed after and while the National Bankruptcy Act was in force and that, consequently, it could not technically be suspended or superseded; but the answer to this is, that it was still-born, never had any life and never went into operation."

Notwithstanding these positive assertions we are better satisfied to rest upon the firm foundation laid nearly a century ago by the sages of the law in the celebrated cases. hereinbefore cited, at least until such foundation shall be shaken in the tribunal wherein it. was first established. But we are not alone in assuming, nor the first to assume this position. For in the case of *Old Town Bank* v. *McCormick*, 96 Md. 341 (1903), it was held that a State law under which persons engaged chiefly in the tillage of the soil may be proceeded against by their creditors was not superseded by the Bankrupt Act of 1898. The opinion of Fowler, J., reads as follows:

"This is an appeal from the Circuit Court for Harford county. On the 22d of May, 1901, the Old Town Bank of Baltimore filed a petition in insolvency against J. Lawrence McCormick and others under the provisions of Art. 47, secs. 22 and 23, of our Code, relating to insolvents, as amended by the act of 1896, ch. 446. The defendants each pleaded to the jurisdiction of the Court. Their pleas are identical. The plea is as follows: ' (1) That this Court has no jurisdiction in these proceedings, because the insolvency laws of' the State of Maryland have been suspended, superseded, or rendered inoperative by the passage of a National Bankrupt Law by the Congress of the United States, and this defendant pleads the said bankrupt law in bar of the jurisdiction of this Court in the premises.' The plaintiff bank.

demurred to these pleas, but the learned Judge below over-ruled the demurrers, and his certificate states the question raised and decided on the demurrers as follows:. 'That the enactment of the Act of Congress approved July 1, 1898, entitled ' An Act to Establish a uniform system of bank-ruptcy throughout the United States,' and supplements and additions thereto, suspended the operation of Art. 47 of the Code of Public General Laws of Maryland, 1888, entitled ' Insolvents,' and all amendments thereof, and especially suspended the operation of sec. 22 (as repealed and amended by the Act of 1896, ch. 446), and sec. 23 thereof, including the operation of said Article on persons ' engaged chiefly in farming and tillage' of the soil,' and the class of persons to which the defendant, J. Lawrence McCormick, is alleged in the petition to belong, and that this court is without juris-diction to grant any of the relief prayed for in said petition.' From the order dismissing its petitions the plaintiff has appealed.

"The issue thus presented is clear and well defined.

"The defendants contend that the enactment of the National Bankruptcy Act suspended the operation of the whole insolvent law of this State, while the plaintiff maintains the position that the passage of this national law by Congress suspends the operation of our insolvent law, *only so far as our law conflicts with the national law*, and that, inasmuch as the present bankrupt law (Act of Congress, 1898) contains no provision for involuntary bankruptcy of persons engaged chiefly in the tillage of the soil, the provisions of our State Insolvent Law, so far as they apply to that excepted class, remain in full force and effect.

"The question presented must depend, in the first place, upon the provisions of the bankrupt law applicable here. Section 4, 'Who may become bankrupts,' sub-section (a) provides that 'Any person who owes debts, except a cor-poration, shall be entitled to the benefits of this Act *as a voluntary bankrupt.*' And by sub-section (b) it is enacted that 'Any natural person, except a wage earner or a person engaged chiefly in farming or the tillage of the soil . . .

may be adjudged an involuntary bankrupt upon default or an impartial trial, and shall be subject to the provisions and entitled to the benefits of this Act.'   .   .   .

"1. From the year 1819, when Chief Justice Marshall, delivered the opinion of the Supreme Court of the United States in the leading case of *Sturges* v. *Crowninshield*, reported in 4 Wheat. 122, it has been held that the provision of the Constitution of the United States, Art. I, sec. 8, (4) providing that Congress shall have power to establish uniform laws on the subject of bankruptcy, does not *in itself* inhibit the States from passing valid insolvent laws.   In the case just cited it was said: 'It is not the mere *existence* of the power, but its *exercise*, which is incompatible with the exercise of the same power by the States.'   And so also there has been a uniform line of decisions to the effect that so far as Congress has failed to legislate with reference to insolvents, State laws relating to them are operative.   Thus in *Sturges* v. *Crowinshield, supra*, it is said that 'if it is not the mere *existence* of the power but its actual *exercise* by the Congress of the United States which prevents the operation of State insolvent laws it is obvious that much inconvenience would result from that construction of the Constitution which should deny to the Legislatures of the States the power of acting on this subject in consequence of *the grant* to Congress.'   'It may be thought more convenient', continued the court, 'that much of it should be regulated by State legislation, and Congress may *purposely omit to provide for many cases* to which its power extends.   It does not appear to be a violent construction of the Constitution, and certainly a most convenient one, to consider the power of the State *as existing over such cases as the laws of the land may not reach.'*   But in *Ogden* v. *Saunders*, 12 Wheat. 213, the rule is explicitly laid down that 'the power of Congress to establish uniform laws on the subject of bankruptcy does not exclude the rights of the States to legislate on the same subject, except when the power has been actually exercised, and *the State laws conflict with those of Congress.*   And to the same effect are *Baldwin* v. *Hale*, 1 Wall. 229, *Tua* v. *Carriere*, 117

U. S. 210; *Ex parte Eames*, 2 Story, 322.    In the recent case
of *R. H. Herron Co.* v. *Superior Court, &c.*, decided in April
of last year by the Supreme Court of California, and reported
in 68 Pac. Rep. 814, 136 Cal. 279, it was held that 'though
the Federal Bankruptcy Acts suspend operation of any
State laws of insolvency, where there is any conflict between
the two, the State laws remain in full force in so far as there
is no conflict; and as the Bankruptcy Act of 1898 *expressly*
*exempts* all corporations from *voluntary bankruptcy*, and only
makes subject to involuntary bankruptcy, corporations en-
gaged principally in manufacturing, trading, printing, pub--
lishing, or mercantile pursuits,' and the provisions of the
State law applicable to a corporation engaged principally in
mining (as was the California corporation) are not suspended.
In the course of its opinion the court said: 'If the Bank-
ruptcy Act excepts a class of cases from its operation, either
in express terms or by necessary implication, it must be
considered that it was the intention of Congress not to inter--
fere in that class of cases with the laws of the several States
in reference thereto.'   A number of cases are cited by Justice
Harrison, who delivered the opinion of the court, and among
them is that of *Clarke* v. *Ray*, 1 Har. & J. 318, C. J. Chase
delivering the opinion of the court.  He said: 'The Legis-
latures of the several States have competent authority to
pass laws for the relief of all persons who are not compre-
hended within the Acts of Congress.'  See also, *Van Nostrand*
v. *Carr*, 30 Md. 128.   It should be remarked however, that
the situation in the California case just cited somewhat differs
from the one here presented.   For there the insolvent pro-
ceeded against under the California Insolvent Law was ex-
pressly excepted from the provisions relating to the voluntary
system, and was not included within, and therefore excepted
by implication from the class of corporations made subject
to the involuntary system, while here the defendant who is
sought to be declared an insolvent under our insolvent law
is included under the general terms of the voluntary system
and expressly excepted from the involuntary system.   See
also, *E. M. Shepardson's Appeal*, 36 Conn. 23; *Geery's*

*Appeal,* 43 Conn. 289; *Steelman* v. *Mattix,* 36 N. J. L. 344; 16 Am. & Eng. Ency. 642 (2nd ed.).

(3) "2. This brings us to the real question in the case, namely, is there any conflict between our Insolvent Law and the Federal Bankrupt law?

"We have already transcribed the provisions of Section 4, by which it appears that the defendant is expressly excepted from the provisions of the act relating to involuntary bankruptcy, and, therefore, as to this class to which the defendant belongs, *i. e.,* farmers or tillers of the soil, the Federal power has not been exercised. And it, therefore, follows that if this class is not within the State law, there is no existing provision under which those embraced within it can be compelled to distribute their assets fairly and equally among their creditors. In *Geery's Appeal, supra,* it was said: 'The benefit of this principle (the equal distribution of a debtor's property without preference) cannot be denied to a creditor without doing him injustice. It is a remedy which he relied on in giving credit, and to which he is fairly entitled. If that remedy is not to be found in the Bankrupt Act, it will not be presumed that Congress intended to take away the remedy provided by the State, Congress having limited and restricted the operation of the Bankrupt Act, leaving a number of cases to which it does not apply, it will not be presumed that it was thereby intended to leave creditors in such cases entirely without remedy, as must be the case if the State law is entirely inoperative.' But can it be properly or correctly said that any *conflict* can exist between the State and the Federal law so long as the latter by express terms excludes from its operation the subject or class of persons expressly provided for by the State law? The power to enact insolvent or Bankrupt Laws is vested in the States, and it cannot be extinguished except by the establishment of a Federal system in conflict with the State law. And this Federal system of bankruptcy must be a *genuine* Bankrupt Law (*Sturges* v. *Crowninshield, supra,*) or in other words, as expressed in *Ogden* v. *Saunders, supra,* the power to pass a uniform system of bankruptcy must be

*actually* exercised, and the State law must be in conflict
with it in order to render the latter inoperative. The
question, therefore, logically arises, does the present Federal
Bankrupt Law actually provide for involuntary proceedings
against farmers? And the answer must be that it does not,
but the answer of the defendant goes further and necessarily
must do so in order to save his case. He says it is true
that while this class is not included and is expressly excepted,
from the involuntary feature of the system, yet it is included
in the voluntary feature, and therefore, it is within the
*scope* of the national system. We cannot approve of this
method of reasoning, not only because it would seem to be a
'contradiction in terms to say that cases excepted from the
operation of the most important part of the Act are included
in its scope,' but because it would seem to involve the prop-
osition that the Federal power can render inoperative the
State Insolvent Laws applicable to involuntary insolvency
without establishing a genuine bankrupt law to take the
place of the State law. As we have already seen, it has been
held from an early day, that it is only to the extent that
Congress has *actually* legislated upon the subject that the
statutes of the several States are suspended by its legislation.
How then can it be said that a failure to legislate, in other
words that an express exclusion, raises a conflict? But with-
out pursuing this question further it seems to us that the posi-
tion taken by the defendant must necessarily lead to the con-
clusion that if the Congress of the United States can by in-
cluding this class in the voluntary part of the system and
excepting it from the involuntary part withdraw *it* from the
operation of our State Insolvent Law, it can do the same in
regard to any two or more classes, as for instance merchants,
traders, and corporations, and the result would be that in
spite of the failure on the part of Congress to establish a
Bankrupt Law, that is to actually exercise the power con-
ferred by the Constitution to pass a genuine Bankrupt Law,
State legislation would become inoperative and creditors
would be deprived of a remedy to which, as was said in
*Geery's Appeal, supra,* they are fairly entitled.

"But it was forcibly argued on the part of the defendant that sec. 72, sub-sec. (b) of the Bankrupt Act of 1898, shows that it was the intention of Congress to substitute that Act for *every* provision of *every* insolvent law of the several States. It provides as follows: 'Proceedings commenced under State insolvent laws *before* the passage of this Act shall not be affected by it.' To sustain their view the case of *Parmenter Manufacturing Co.* v. *Hamilton,* 172 Mass. 178, decided in 1898 was relied on. But all this case decides is that the Federal Act deprives the State Court of jurisdiction to entertain jurisdiction in insolvency proceedings filed after 1st July, 1898, when the Federal Act went into force. Or as the court said: 'The Act is to go into full force and effect upon its passage. That is to say, the rights of all persons, *in the particulars to which the Act refers,* are to be determined by the Act from the time of its passage.' After mentioning a number of the rights which are determined by the Act, the opinion continues: 'These various provisions affecting the rights and conduct of debtors and creditors are different from those previously existing in most of the States, and perhaps different from those found in the laws of any State, and they supersede *all conflicting provisions.*' In the concluding part of the opinion the distinguished Judge who has recently been appointed Chief Justice of the Supreme Judicial Court of Massachusetts, said that the language of sec. 72, sub-sec. (b) 'was chosen to make clear the purpose of Congress that the new system of bankruptcy should supersede all State laws in regard to insolvency from the date of the passage of the Act,' but necessarily this language means only that all *conflicting* provisions of the State law were thus superseded, for this is the well-settled proposition which he had just announced in a preceding sentence, and which we have quoted above. If therefore, we are correct in the conclusion already reached that there is no conflict between the provisions of our insolvent law and the present Bankrupt Law, it follows that the language of sec. 72 relied on by the defendant can have no influence upon our conclusion in this case.

"But, again, it was urged that there is a distinction between this case and cases which arose under laws which did not include *the class* within its scope, as for instance, where the Bankrupt Act applied only to debtors whose debts exceeded $300. It was held in *Shepardson's Appeal, supra,* that in cases where the debts were less than $300 the State law was not suspended, and debtors of that class could be proceeded against under State laws. But the true rule was laid down by Chief Justice Marshall in *Sturges* v. *Crowinshield, supra,* that the power of the State continues to exist over such *cases* as the Federal law does not reach. And, therefore, if cases involving involuntary proceedings against a class are not provided for by the Federal law, such cases are within the reach of the State law in spite of the fact that the members of this same class may avail themselves of the voluntary feature, otherwise the rule laid down by Chief Justice Marshall would have to be changed so as to read that the power of the State exists only over such cases as are against natural persons or corporations not within *any class* provided for by any provision of the Federal law. If this were the rule, then, of course, it would follow as contended that the defendant, being of the class called farmers, and the Bankrupt Act having provided he may avail himself of the voluntary feature, no case *against him* could be reached by the State law. But in our opinion this is not the proper view, for as we have already said it is not within the power of Congress to render inoperative the involuntary feature of State insolvent laws as to any particular class by excepting that class from the involuntary part of the national law. Otherwise the result would be that the State laws as to involuntary insolvency would become inoperative by the mere existence of the power of the United States to establish a system of involuntary bankruptcy. We have seen, however, that it is not the mere *existence,* but the *exercise* of the power to establish a *genuine* bankrupt law in conflict with the State laws, which renders the latter inoperative. *Sturges* v. *Crowninshield, supra.*

"In conclusion, it may be proper to say that if it is the

policy of our State to render farmers and tillers of the soil, like other persons subject to the involuntary system of our insolvent laws, as it is declared to be by the provisions of our Code, Art. 47, secs. 22 and 23, we should not by any strained construction of an Act of Congress, or by a course of ingenious reasoning, attempt to thwart this purpose.

"From what we have said, it will be seen that we are of opinion that the order appealed from should be reversed."

For the foregoing reasons the respondent's motion to (4) dismiss must be denied.

We next proceed to the consideration of the constitutional questions certified to us as aforesaid. Are the provisions of Gen. Laws, 1909, cap. 339 in conflict with U. S. Const. Art. I sec. 10, and R. I. Const. Art. I, sec. 12, in that they impair the obligation of contracts? The particular portions of the statute claimed by the respondent to be so obnoxious are secs. 28, 37, 39 and 50, which respectively read as follows:

"Sec. 28. Debts of and judgments against the insolvent may be proved and allowed against the estate, which are owing at the time of the filing of the petition by or against him, whether then payable or not, with any interest thereon which would have been recoverable at that date, or with a rebate of interest on such as were not then payable and did not bear interest; also any claims against the insolvent which may be liquidated after the filing of the petition, and growing out of any contract or promise, absolute or contingent, express or implied, whether the breach occurred before or after the commencement of proceedings in insolvency, or growing out of the rejection by the assignee of the privileges of an unexpired contract, or growing out of trover, replevin, or any tort, less any costs incurred or interest accrued after the filing of the petition; also any debts or judgments which are a fixed liability, as acceptor or drawer, indorser, surety, bailor, or guarantor, on any note, bill, bond, specialty, or contract, or for the debt of another. Claims not mentioned in this section shall not be provable against the insolvent estate."

"Sec. 37. The court or register shall, by an instrument under its or his hand, assign and convey to the assignee all the estate, real and personal, of the debtor, except such, other than bills of exchange and negotiable promissory notes, as is by law exempt from attachment, and all his deeds, books of account and papers relating to his property conveyed, which instrument shall operate to convey all said property of such insolvent in this state. Such deeds, books of account and papers, after discharge is obtained or composition effected, shall be returned to such debtor. Every insolvent shall execute to his assignee conveyances of all his property in any other state or territory of the United States, in the District of Columbia, or in any foreign country. If such conveyance be not made within twenty days after the appointment of the assignee, then the creditors at a creditors' meeting may elect to have his property in this state distributed under this chapter, but in such case said debtor shall not be entitled to a discharge; or they may apply to the court for an order upon such insolvent for such conveyance, which order, if not complied with, may be enforced by proceedings in contempt." . . .

"Sec. 39. The assignment shall vest in the assignee all the property of the debtor, real and personal, which he could have lawfully sold, assigned, or conveyed at the time of the first publication of the notice of the adjudication, in case of voluntary proceedings, and at the time of the first publication of notice of the filing of the petition in case of involuntary proceedings, and shall be effectual to dissolve any attachment, any levy, and any lien placed upon his property in fraud of his creditors not more than four months prior to the time of the first publication in either case aforesaid. The assignment shall also vest in the assignee all property conveyed not more than four months prior to the first publication in either case aforesaid by the debtor in fraud of his creditors or in fraud of this chapter, all property conveyed by an assignment for the benefit of creditors made not more than four months prior to the time of the first publication afore-

said, and all debts due to the debtor or any person for his use, and all liens and securities therefor, and all his rights of action for goods or estate, real or personal, and all his rights of redeeming such goods or estate.　The assignee may, with the approval of the court, on ex-parte application therefor, redeem all mortgages, conditional contracts, pledges, and liens of or upon any goods or estate of the debtor, or he may sell the same subject to such mortgage or other incumbrance; and if a mortgage hereafter given is foreclosed, pending proceedings in insolvency and before the appointment of an assignee, or within sixty days thereafter, the assignee, when appointed, may, with like approval, redeem the same at any time within sixty days after the appointment, with rights similar to those provided by law for the redemption of mortgages before foreclosure."　.　.　.

"Sec. 50.　A discharge in insolvency shall release an insolvent from all his provable debts due to citizens of this state, and from all his provable debts due to all other persons who shall become parties to the proceedings by proving their claims as herein provided, except to such as have priority as provided in section fifty-eight of this chapter."

The respondent Mowry claims that the obligation of his contract with the respondent Smith is impaired by the foregoing provisions of the statute in question.　The following extracts from his answer to the bill in equity and from his statement of the constitutional questions, which answer and statement were filed in the Superior Court on the same day, contain all the information submitted to us upon the subject.　Paragraph 3 of the answer reads as follows: "3.　This respondent further answering says to the 3rd, 4th, 5th and 6th paragraphs of the complainant's bill, that on or about the 30th day of September, A. D. 1909, said Clarence A. Smith conveyed said real estate described in the 3rd paragraph of complainant's bill by deed to respondent Marquis D. L. Mowry and also on or about the 30th day of September, 1909, transferred by deed the moneys deposited with the Industrial Trust Co. to Marquis D. L. Mowry and

further says on, to wit, the 5th day of January 1907, James N. Smith, guardian of the person and estate of Hope T. Williams sued out of the Superior Court for Providence and Bristol Counties a writ of attachment wherein this respondent, Clarence A. Smith was made defendant and said writ was served by attachment of real estate described in the 3rd paragraph of the complainant's bill and said moneys deposited in the Industrial Trust Co. were attached by garnishee process upon said writ, said writ was returned to and the writ and declaration entered in said cause in said court on, to wit, the 21st day of January, 1907, said cause being numbered 22484. Hope T. Williams died on, to wit, the 28th day of February, 1907, and left a last will and testament which will was duly proved and said James N. Smith was appointed executor in said will and he accepted said trust and on the            day of            entered his appearance of said case as such executor against said Clarence A. Smith, in which suit the respondent Mowry was attorney for said respondent Clarence A. Smith in said Superior Court and such proceedings were had in such case, it was continued from time to time, it was carried to the Supreme Court on defendant's exceptions, *etc.*, that on June 11, 1909, the exceptions were overruled in the Supreme Court, and case was remitted to the Superior Court by direction of Supreme Court as of May 6, 1909, judgment on the verdict for plff. for $4,578.36, debt and costs $45.95, was entered in Superior Court, and thereafterwards, to wit, on the day of June, 1909, execution was taken out of said Superior Court by said executor James N. Smith upon said judgment and placed in the hands of Samuel Gardiner a deputy sheriff for service and said Gardiner made service of said execution upon the real estate described in the 3rd paragraph of complainant's bill, being the same real estate taxed (attached) on the writ of January 5th, 1907, and said deputy posted up notices and advertised said land for sale on the 9th day of October, 1909 at 12 o'clock noon at a public auction held in the office of said sheriff for the County of

Providence, in pursuance of said notices and advertisements for sale, he sold said land to Caroline E. Smith the highest bidder therefor at said sale, for the sum of seven hundred (700) dollars and this respondent is informed said deputy received said money, and gave said Caroline E. Smith sheriff's deed of said land so attached being all right, title and interest in the land so attached and sold to said Clarence A. Smith which said conveyance to said Mowry respondent of said land so attached and sold was made subject to said attachment on said writ dated the 5th day of January 1907 and attached long before said chapter 399 in the general laws was passed in settlement of legal services rendered by said Mowry, attorney for Clarence A. Smith according to the statements filed in this case on the constitutional questions in said case raised long before said cap. 399 was passed and the said respondent Mowry avers that he did not receive said conveyance of said land from said Smith with any intention or purpose on his part to aid or assist said Smith to hinder, delay or defraud his creditors, or either or any of them, and did not receive said conveyance of said land from said Smith for the purpose of becoming and knew not that he then was or now is a preferred creditor of said Smith and that the said respondent Mowry at the time of taking and receiving said transfers, conveyances and assignments of said real estate and money knew not, had no reason or cause to know or believe said Clarence A. Smith was an insolvent, or was acting in contemplation of insolvency, and denies that said transfer, conveyances and assignments were by said Smith made to said Mowry with the intent to delay, hinder and defraud his creditors or either of them or with the intention and purpose of preferring said Mowry as a creditor." And the statement of constitutional questions hereinbefore referred to contains the following: "Second. That such law perhaps is valid to discharge only as it refers to contracts made after the law was passed, but it makes no distinction in this respect, it purports expressly to discharge and release debts existing at the time the law was passed and took effect,

and debts and contracts *both executed and executory, express
or implied made and existing before and at the time said law
was passed,* and it makes no provision for a jury trial in the
matter of the discharge and release of such contracts,
whether made before or after the law was passed, and it is
retrospective in its operation.

"Third. Said conveyance of the real estate described in
the plaintiff's bill, in the third section thereof and the trans-
fer of the money deposited with the Industrial Trust Com-
pany, mentioned in said section of said bill as conveyed and
transferred by said respondent, Clarence A. Smith, to said
Marquis D. L. Mowry, respondent, on the 30th day of
September, 1909, was in pursuance of a settlement made on
or about the 19th day of June, A. D. 1909, for legal services
rendered and specified in the statement hereto annexed by
said Mowry for said Clarence A. Smith, legal services ren-
dered and performed before such law was passed, and in the
performance of contracts made long before said cap. was
enacted, May 26, 1908, and in the completion of contracts
for legal services entered into for said Smith by said Mowry
before said May 26, 1908."

"Fifth. Which said cap. 339 and said sections 28, 37,
39 and 50 of said cap. are inconsistent with, in conflict with
and repugnant to said sections of the constitution of the
United States and the State of Rhode Island, hereinbefore
mentioned in this, that it impairs the obligation of contracts,
and such cap. and sections are retrospective if under its
operation such conveyance and transfer of property, real
and personal, may be set aside, and discharge and release
contracts completed and contracts entered into before and
being performed when it was enacted, and whether said
claims are proved or not as specified in said act."

"Sixth. The conveyance of Clarence A. Smith of the real
estate mentioned in the fourth paragraph of the complain-
ant's bill and the assignment and transfer by said Smith to
said Marquis D. L. Mowry of the money deposited with the
Industrial Trust Company, said real estate being described

in the 3rd paragraph of the complainant's bill and said money so deposited being therein specified in said 3rd section."

And in the seventh paragraph he states that about June 19, 1909, said Smith was indebted to him in the sum of $2,000.00 for professional services rendered to said Smith, beginning in August, 1904, and continuing from thence to the first mentioned date, and he has appended an itemized statement of his bill, together with a copy of the statement of his claim made by Clarence A. Smith in his schedule and list of creditors as follows: "3. Marquis D. L. Mowry, N. Smithfield, R. I. $2,000.00 (He has already received payment by conveyance of real estate, *viz.* farm at 756 Greenville Ave. Johnston, R. I. and also tract of land about half a mile away. But if such conveyance should be set aside I would owe him the above amount)."

From the foregoing excerpts we are led to infer that the contract entered into by the respondents Mowry and Smith in August, 1904, was the ordinary contract of attorney and client, in which the former was engaged by the latter to perform legal services for which the latter was to pay a reasonable compensation. It is unlikely that the parties to the contract at that time could have foreseen or anticipated the amount or the value of the services to be performed and rendered in the five years that were to ensue. It does not appear and the claim is not made that the contract was in writing, nor does it appear that there was any agreement or understanding that payment for the services to be rendered was to be made in land, which agreement would be void unless it was in writing, signed by the party to be charged, or in any specific article or out of any particular fund. Moreover, it does appear, in the third paragraph of the statement of constitutional questions, that the conveyance of the real estate and the transfer of the money on deposit from respondent Smith to respondent Mowry on or about September 30, 1909, was done in pursuance of a settlement made on or about June 19, 1909, for the legal services aforesaid. If it is claimed that the contract, whereof the obligation is said to be

impaired by the provisions of the statute under consideration, is the contract of settlement made in June, 1909, then the sufficient answer to such claim is that the statute was in force at the date of such settlement and entered into such contract as part of the existing law. How the statute operates to impair the obligation of any contract existing between said Mowry and Smith is not apparent. It nowhere appears that Mowry agreed to wait for payment for his services until the conclusion of the litigation. It does appear that his services consisted in defending Smith against law suits that were brought against him for misappropriation of funds, and that he was not attempting to collect a debt or to recover damages for Smith, in which circumstances he might have hoped to recover a sum out of which his services could be paid. If he had exercised due diligence in the collection of his charges against Smith from time to time as they arose, they would not have accumulated to the amount of two thousand dollars. The value of his contract with Smith may have been impaired by his own good natured neglect, but the obligation of the contract remains unimpaired by the statute. We are therefore of the opinion that the statute does not conflict with either the constitution of the United States or that of this state in respect to the impairment of the obligation of said contract. Neither does it appear to be retroactive in respect to the case under consideration.

(5)    The remaining constitutional question to be considered is whether said insolvency statute violates the provisions of Art. XIV of Amendments to the U. S. Constitution or of R. I. Const. Art. I, sec. 10, in causing the respondent Mowry to be deprived of his property, without jury trial and contrary to the law of the land. It does not appear in these proceedings how any such dire result is to be apprehended nor how it may be accomplished. The present suit is a direct attempt to reach property held and claimed by the respondent Mowry, but therein a jury trial may be had upon any issue of fact; and certainly a suit in equity brought to recover

property alleged to have been conveyed in fraud of creditors is and long has been recognized as being an appropriate proceeding for that purpose in the law of the land.

Our answer to the constitutional questions raised by the respondent Mowry is that the provisions of Gen. Laws, 1909, cap. 339, hereinbefore referred to, are not in conflict with the provisions of U. S. Const. Art. I, sec. 10, nor with those of Art. XIV of the amendments to the same. Neither do they conflict with the Constitution of R. I. Art. I, secs. 10 and 12.

Having thus decided the constitutional questions certified to us, the papers in the case with our decision certified thereon are sent back to the Superior Court for further proceedings.

*James Harris, Irving Champlin,* for complainant.
*M. D. L. Mowry,* for respondent.