JAMES A. REYNOLDS *vs.* WASHINGTON REAL ESTATE COMPANY.

PROVIDENCE—JULY 15, 1901.

PRESENT : Stiness, C. J., Tillinghast and Rogers, JJ.

(1)  *Equity.   Injunction.   Leases.   Construction.*

A. leased by instrument in writing certain premises to B., "together with power not exceeding six horse for the conduct of the lessee's business—that of a steam laundry—also steam for washing-machines and dry-room, also all water for use in the business.

"In case of any interruption or stoppage of power, the lessors agree to

furnish steam sufficient to run a small engine—to be furnished by the lessee—in lieu of the six horse above mentioned.

"All power furnished by the lessors in excess of six horse power will be charged at the rate of seventy-five dollars per horse power, and the lessee hereby agrees to pay for any excess of said stipulated six horse power at the rate of seventy-five dollars per horse power at the time of payments provided for the rent agreed upon." The respondent threatened to cut off the lessee's supply of power and steam, on the ground that he was using steam in excess of six horse power :—

*Held,* that the words "power" and "steam" were used in the lease for different purposes and to accomplish different ends, the one to be in addition to the other, and that the lessee was not limited in the amount of power and steam combined to six horse power, but that the amount of steam was only limited to its use for washing-machines and dry-room.

*Held,* further, that the complainant was entitled to a permanent injunction against the respondent.

BILL IN EQUITY seeking an injunction on ground fully set forth in the opinion.    Heard on bill, answer, and proofs, and relief granted.

ROGERS, J.    This is a bill in equity brought by a lessee against his lessor, to enjoin the lessor from carrying out certain threats made by it as to shutting off power and steam from the premises hired by the lessee, the putting of which into execution would compel the lessee to close his establishment and deprive him of his business.

The lease under which the controversy arose was in writing, and leased to the complainant for five years from April 1, 1899, (in the words of the lease) the following described premises, viz.:

(1)    "Store corner of Mason and West Exchange streets, also room in rear, and thirty foot front by seventy feet deep on second floor, together with power not exceeding six horse for the conduct of the lessee's business—that of a steam laundry, also steam for washing-machines and dry-room, also all water for use in the business.

"In case of any interruption or stoppage of power, the lessors agree to furnish steam sufficient to run a small engine —to be furnished by the lessee—in lieu of the six horse above mentioned.

"All power furnished by the lessors in excess of six horse

power will be charged at the rate of seventy-five dollars per horse power, and the lessee hereby agrees to pay for any excess of said stipulated six horse power at the rate of seventy-five dollars per horse power at the time of payments provided for the rent agreed upon."

The rent was $700 per annum in payments of fifty-eight 33/100 dollars each on the first day of each month successively, to the end of the term; and in case of failure of the lessee to pay any rent within ten days subsequent to the time as above specified, or in case of failure to conform to all the conditions of said lease, the lessor was at liberty to declare it at an end, and thereupon to take immediate possession of the premises, in which case the said lessee should be considered as a tenant holding over his term.

There were also various covenants contained in the lease which have no bearing on the point in controversy.

The bill, besides setting out the provisions of the lease, stated that the complainant had, upon the making thereof, removed his business into said leased premises, that he had on his part complied with all the provisions of said lease, that he had never used power in excess of six horse power, notwithstanding which the respondent on November 15, 1900, wrote to the complainant as follows, viz.: "We will charge you for 14 (fourteen) horse power at $50 a horse, making $58.33 additional on your rent per month from November 1, 1900;" that on January 15, 1901, the respondent threatened that if the complainant did not pay the above amounts, he, the respondent, would, on January 21, 1901, turn off the power and steam the complainant was using which the complainant averred would compel him to close his establishment and which deprive him of his means of earning a livelihood; and that the complainant believed the respondent would carry its threat into execution.

The bill prayed for an injunction against the respondent from prosecuting its threat to discontinue the supply of power and steam which it covenanted to furnish the complainant, and for general relief.

The respondent's answer admits the making of the lease

but denies the complainant's allegation that in said lease the respondent agreed to furnish power with which to conduct the complainant's business, not exceeding six horse power, together with steam for washing-machines and dry-room, but, on the contrary, avers that under said lease the respondent is obliged to furnish power, not exceeding six horse power, for the conduct of the lessee's business, and that this provision is not limited to motive power for the running of the complainant's machinery but that it embraces generally all power furnished by the respondent for the conduct of the complainant's business whether said power is transmitted by means of a shaft connected with the respondent's engine, or by means of steam conducted through pipes. The respondent further averred that the steam furnished by it for the washing-machines and dry-room, is live steam with a pressure of ninety pounds to the square inch and is power for the conduct of the complainant's business within the meaning of said lease, for which under the provisions of said lease, the complainant agreed to pay for all power in excess of six horse power at the rate of $75 per horse power *per annum* at the time of the payments provided for the rent agreed upon in said lease. The respondent denied that the complainant had never used power in excess of six horse power, but averred that the complainant had used power largely in excess of six horse power, viz.: to the amount of seven horse power for the running of complainant's machinery, and to the amount of thirteen and seven-tenths horse power, and at times in excess thereof, for the washing-machines and dry-room by means of live steam furnished through pipes with a pressure of ninety pounds to the square inch. The respondent admitted that it threatened that if the complainant did not pay the rent reserved under said lease and did not pay for the power used by him in excess of six horse power at the rate of $50 per horse power (the reduction to $50 per horse power having been made, it claimed, by reason of the large excess used by said complainant), it would turn off the power and steam the complainant was using. Finally, the respondent denied that the complainant had at all times complied with the terms of the lease, but averred

that the complainant had not paid nor tendered payment of rent for the months of November and December, 1900, or any part thereof, under said lease, nor for the excess of said six horse power furnished during said period as provided for in and by said lease. Issue having been joined the suit comes before us now for disposition on the pleadings and proofs.

Unless the complainant has himself complied with the provisions of the lease he is in no position to demand compliance with it by the respondent, and the first question logically arising for consideration is, has the complainant paid or tendered the rent due for November and December, 1900? The complainant and one Dodd both swear most clearly and unequivocally, that early in December, 1900, and again early in January, 1901, and both times within the time limited in which rent was to be paid, they called on the respondent and saw its secretary, Mr. Isaac Hahn ; that the respective calls were made for the purpose, and the sole purpose, of paying, or tendering payment of the monthly rent ; that Dodd accompanied the complainant, at the latter's request, for the express purpose of acting as a witness to the payment, or tender, and that such tender was made, the denominations of the currency in which it was made, being given. Said Hahn denies that any tender was made on either occasion, though he admits that the complainant and Dodd called and talked about rent, and about power and steam. Two or three witnesses, casually present, swore they did not see any tender made, but as the matter did not concern them at all, and they had no particular interest in, or occasion to observe, what was going on, their testimony is entitled to but little weight. It would, indeed, be incomprehensible if two men going on a special errand, prepared and arranged for by taking a witness for the sole purpose of seeing the act done which was the object of both calling there, and then swearing with the exactness and detail that they would be enabled to by such premeditated arrangement, if no such tender had been made, for everyone agrees that they both called in December and January. If not true the testimony of the complainant and of Dodd is deliberate perjury, while the testimony of the others is reconcilable with

the theory of mistake and lack of observation of what had no interest to them, save as to Hahn, and it is easier for us to believe that he was mistaken, than it is to believe that Reynolds and Dodd both committed willful and deliberate perjury.   We are of the opinion from the preponderance of the testimony that the complainant tendered the rent due for November and December, 1900, respectively, and that there was no failure to comply with the provisions of the lease in that respect.

The vital question in this case, however, is what was the lessee to receive under this lease for the annual rent of $700 which he agreed to pay?

" The golden rule of construction," says Bramwell, B., in *Fowell* v. *Tranter*, 3 H. & C. 458, 461, " is, that words are to be construed according to their natural meaning, unless such a construction would either render them senseless, or would be opposed to the general scope and intent of the instrument, or unless there be some very cogent reason of convenience in favor of a different interpretation."

In *Anthony* v. *Comstock*, 1 R. I. 454, 458, speaking through Haile, J. delivering the opinion, this court said :   " It is a settled rule of construction of contracts, that the intention of the parties must govern when that intention can be clearly inferred from the terms of the contract, and can be fairly carried out consistently with the settled rules of law."

Following these simple rules the language of the lease seems so plain that it is not easy to see how any difference could arise as to its construction.   What the complainant hired under the lease was a certain store on the corner of Mason and West Exchange streets, also room in rear, &c., " together with power not exceeding six horse for the conduct of the lessee's business—that of a steam laundry, also steam for washing-machines and dry-room, also all water for use in the business."   The lease, then, covered certain space or rooms in a building furnished with power not exceeding six horse power ; also (or in addition thereto) steam for specified purposes ; also (or in addition thereto) all water for use in the business.   The amount and location of floor space was

limited in the description. The amount of power was also limited, viz., to six horse power. The amount of steam was limited, inasmuch as it was limited to use only for washing-machines and dry-room; and the water was limited in that it was all for use in the business.

It is contended by the respondent that though *power* and *steam* are two words, yet they are synonymous in meaning, in the lease in question; and that notwithstanding the use of both words, and also notwithstanding the use of the word *also*, the amount of power and of steam combined, included under said lease without paying extra therefor, is limited to six horse power, if they can be so measured or determined.

To adopt any such construction for the language of the lease would be to do violence to the signification of one of the most simple and familiar words in the English language. The word *also*, which is used three times in the sentence of less than five lines of description of the premises let, is defined in Webster's International Dictionary, in cases where its use is not obsolete, as meaning "In addition; besides; as well; further; too." In that same sentence the words *power* and *steam* are both used, and so discriminatively that it is clear that they are used intentionally with a different signification. If there were any doubt upon the question whether the two words are used with different significations, and not synonymously, the very next sentence of the lease would set that doubt at rest. That sentence is as follows, viz.: "In case of any interruption or stoppage of power, the lessors agree to furnish steam sufficient to run a small engine—to be furnished by the lessee, in lieu of the six horse above mentioned." It needs no expert to inform us that steam is the elastic, aëriform fluid into which water is converted, when heated to the boiling point, that it is an element of power, and when that power is transmitted or applied, by means of a mechanism termed a steam-engine it furnishes what is known as applied or transmitted power, or motion for practical purposes, like the running of machinery. Steam, however, is not the only source of power as there is water power, electric power, etc. In the case at bar steam power was doubt-

less contemplated when the word power was used, though any other applied or transmitted power that would run machinery, if amounting to six horse, would have filled the requirements of the lease as to power. The steam to produce the power to run the complainant's machinery was evidently not intended, save in a certain contingency, to be carried on to the premises leased, but was to be transmitted from the lessor's engine-room by means of shafts, pulleys, and belting, to the leased premises, where the power could be communicated to the lessee's machinery in like manner by shafts, pulleys and belts. In the contingency of an interruption or stoppage, from any cause, of power thus transmitted, the lessor was to furnish an amount of steam sufficient to run a small engine, to be furnished by the lessee, in lieu of the six horse above mentioned. It will be observed that the steam' thus furnished to run the six horse power engine, was to be in lieu of the power, and not in lieu of, but in addition to the steam to be furnished for washing-machines and dry-room.

It is apparent that steam may be used for other purposes than merely furnishing applied power, or motion for the running of machinery, viz., for heating or drying, whether heating water as for the washing-machines, or drying cloth or clothes, as in the drying-room of a laundry. For these latter purposes the steam itself would be conveyed through pipes to the leased premises, and when the words *power* and *steam* are used in said lease, they are used, as it seems to us clearly enough, for different purposes and to accomplish different ends, the one to be in addition to the other.

The common speech of people indicates that there is a difference between *steam* and *power* in the popular understanding, at least, for we speak of heating our houses by, or with, steam, but never by, or with, power. We inquire of a manufacturer by what power he runs his mill, and he replies steam, water, or electric power,—as the case may be, and the question excites no surprise. If, however, *steam* and *power* mean the same thing, it would be a very idle inquiry as to *what* power was used to run the mill inquired about.

Several experts were called on both sides to give their

opinion as to whether steam, or steam under ninety pounds pressure, was to be considered as power; though why ninety pounds pressure was selected as the pressure we fail to see, except it was more convenient for the lessor to furnish that pressure, for the lease did not call for steam under any particular pressure.   One of the respondent's experts, a mechanical engineer, Mr. Thomas A. Evans, testified that steam is power because heat is power, viz.: "Q. You say then that steam is power because heat is power?   A. Exactly, that is what it is."   Record, p. 41.

.Mr. Knight C. Richmond, a mechanical engineer and expert called by the respondent, testified *inter alia* as follows, viz.: "Q. Did you say that steam transmitted the power, Mr. Richmond?   A. I say that steam is one of the agencies for transmitting power.   Q. How does it transmit it?   A. It depends upon what purpose the power is to be used for.   In a steam-engine, it is due to the expansive force of steam under pressure, in which case it does work against the piston of a steam-engine.   If used for heating purposes, it transmits the power by transferring its heat to the vehicle which is to be heated.   In either case, the measurement of the steam is commonly taken in horse power unit."   Record, p. 99.

Mr. Richard H. Rice, a mechanical engineer and expert called by the respondent, testified in part as follows, viz.: "Q. Will you define steam, Mr. Rice, please?   A. There are two definitions of steam which I think should be given. One the commonly accepted definition, and one the technical definition.   The technical definition of steam is, the vapor of water.   The commonly accepted definition of steam is this vapor of water confined in space and at a definite and usually moderate pressure.   Q. Will you define power?   A. Power is the capacity to do work, useful work.   Q. Then steam and power are not one and the same thing, are they?   A. Steam and power are not one and the same thing, of course, technically, but as commonly accepted they are.   Q. I don't care about the commonly accepted term, but are they in reality the same thing?   A. Steam possesses power.   Q. Possesses

power? A. Yes. Q. But it is not power? A. It is not power. I am speaking now in the strictly technical sense. Q. Precisely. If this vapored water that you speak of as the definition of steam, if it is not confined in space, is it power? A. It possesses power. Q. But it isn't power? A. It isn't power." In his redirect examination he testified that live steam furnished through pipes under a certain pressure, namely, ninety pounds to the square inch, is considered power. Record, pp. 100, 101.

Mr. Gardner C. Sims, a mechanical engineer and expert called for the complainant, testified in part as follows, viz.: "Q. Could you make a distinction between power and steam, Mr. Sims, or what is the difference between power and steam? A. Steam is an elastic fluid generated by heat to the boiling point of water, and power would be the application of pressure. Q. In your opinion would steam furnished under pressure of ninety pounds to the square inch, live steam, so-called, for wash-room and dry-room for laundry purposes, be considered power? A. No sir, it would not." In cross-examination Mr. Sims further testified as follows, viz.: "Steam at ninety pounds pressure in a pipe is not power, but passing through a pipe into a cylinder it produces power;" and further in reply to interrogatories he swore: "Q. Then do I understand you to say that it is the expansive power of the steam under pressure that is the power? A. No; it is the application of the expansive fluid to a mechanism that is transmitting power. Q. Where is the power transmitted from? A. From the steam. Q. The power is in the steam then? A. No; in the machine. Q. Do you mean to say the power is in the mechanism? A. No; the application of steam to the mechanism. Q. The mechanism then is simply an instrumentality for utilization of the power in the steam? A. Yes sir. Q. Then there is power in the steam? A. As applied, yes. Q. And that power is transmitted from the coal which furnishes the combustion passing into the steam? A. Well, that is the primary object of it. I speak in the commercial sense." Record pp. 84, 86, 87.

While the experts differ in their testimony in some particulars, it is perfectly apparent from the preponderance of such

evidence that the words *power* and *steam* are not always used synonymously, and in our opinion, it is in the very sense in which they are not used synonymously that they are used in the lease in question.

We are satisfied, from the preponderance of evidence, that the complainant did not use power, in the true intent and meaning of that word in the lease, exceeding six horse power in amount.    Besides the testimony of various witnesses called by the complainant, the testimony of George Leach, a mechanical engineer and expert called by the respondent, is particularly clear and convincing on that point, the only witness putting the amount of power at a higher figure being the respondent's engineer, who estimated it to be between seven and eight horse power.

If steam, as the word is used in the lease, can be measured by horse power, it does not matter here, as that is not the measure of quantity used in the lease, the only measure being the steam required for the complainant's washing-machines and dry-room, and the evidence shows that the work done by said washing-machines and dry-room has not been increased during the complainant's occupation of the leased premises.

A careful examination of the testimony fails to disclose any just cause for the threat the respondent admits to have made for which the complainant brings this bill.    We fail to find any fraud, or mutual mistake, or ambiguity of terms, in the making of the lease, or any non-compliance with its provisions on the part of the complainant since it was made.    The only apparent ground for the respondent's making the threat complained of, is its desire to get more rent than it agreed to take ; and inasmuch as the lease provides for an addition of $75 rent for each horse power of the power used above the stipulated six horse power, if the respondent is acting in entire good faith it is only less surprising to us that it claims but $50 per horse power for the alleged additional power, thereby doubling the rent only, than that it should under this lease have made any claim at all.

We are of the opinion that the complainant is entitled to a

permanent injunction as prayed in his bill, together with costs.

Decree accordingly.

*John J. Dockry and James Tillinghast,* for complainant.
*Edwards & Angell,* for respondent.