256 A.2d 10.

HENRY M. HILL *vs.* M. S. ALPER & SON, INC.

JULY 15, 1969.

PRESENT: Roberts, C. J., Paolino, Powers, Joslin and Kelleher, JJ.

40

JOSLIN, J. This is a petition by the permanent receiver of M. S. Alper & Son, Inc. for instructions. While the petition nominally relates to the disposition of the proceeds of certain real estate acquired by Alper from the state in the manner hereinafter described, what really was at issue was the right of Abraham Belilove, Esq. to be paid in full for legal services admittedly rendered by and owed to him by the respondent corporation. It was heard by a justice of the superior court sitting within the receivership proceedings, and the receiver, being dissatisfied with his instructions, appeals.

The case has a long history. It began in 1960 when several parcels of land located in the city of Providence and owned by Alper were condemned by the state for highway purposes. See *M. S. Alper & Son, Inc.* v. *Director of Public*

*Works,* 98 R. I. 154, 200 A.2d 583. Following the taking the state found that four of the condemned parcels were surplus to its highway construction needs, and in 1962 it granted Laredef Realty Operators, Inc., a neighboring property owner, an easement or right of way over those parcels for five years, and in addition granted it an option to purchase at the expiration of the easement. Alper challenged the grant as an attempted circumvention of article XVII of the amendments to the state constitution.[1] Its challenge succeeded and a superior court justice ordered the state to make those parcels available to Alper upon the same terms and conditions as it had offered them to Laredef. On appeal decided on February 8, 1965 we sustained. *M. S. Alper & Son, Inc.* v. *Capaldi,* 99 R. I. 242, 206 A.2d 859. Our decision, however, did not bring an end to the litigation. When Alper and the state were unable to agree on what were the terms and conditions upon which the lots had been offered to Laredef, another lawsuit followed. Finally, the superior court fixed $21,862 as the price which Alper would have to pay for the parcels and July 1, 1966, as the last day for payment.

Although it had taken approximately four years of troublesome litigation for it to gain the right of repurchase, Alper lacked the funds to meet the price fixed for a reconveyance, and it appeared that the July 1 deadline might come and pass without Alper being able to exercise the right it had struggled so long to attain. As a direct result of Belilove's efforts, however, State Land Company, Inc., a client of his, became interested and it agreed to lend Al-

---

[1]Insofar as pertinent, article XVII of amendments provides that land condemned in excess of that needed for highway purposes "* * * may be held and improved for any public purpose or purposes, or may be sold or leased for value with or without suitable restrictions, and in case of any such sale or lease, the person or persons from whom such remainder was taken shall have the first right to purchase or lease the same upon such terms as the state or city or town is willing to sell or lease the same."

per the purchase price. Their agreement called for a purchase money mortgage payable in one year, and the transaction was consummated on June 29, 1966. On the same day Alper and Belilove entered into two agreements. In one Alper appointed Belilove its attorney in fact and authorized him to sell or lease the property and generally to deal with it as he saw fit; and in the other, Alper, although then financially unable to pay Belilove for his past services, made certain agreements looking toward a future settlement of those obligations. What those agreements were, while of considerable pertinence, will be discussed later in this opinion. It should not go unnoticed, however, that the trial justice found them "eminently reasonable."

During the following year, Belilove did not dispose of the property under the power of sale, and Alper defaulted in the performance and observance of the terms and conditions of the purchase money mortgage. If a forced sale had then been held the probability was that the only bidders would have been the mortgagee and perhaps Laredef, which needed the property for parking purposes. In order to avoid such a sale and to obtain a larger price for the property than might be obtained at foreclosure, Alper and State Land entered into an arrangement on June 21, 1967, whereby the property was deeded to State Land, which in turn agreed to sell it at public or private sale at such price as it deemed fair and reasonable. State Land further agreed to apply the sale proceeds first to the payment of the balance due on the mortgage loan, and then to satisfy Alper's obligation to Belilove as fixed by the June 29, 1966 agreement. Although the instrument itself is not explicit on what was to be done with whatever balance might remain after thus applying the proceeds, the trial justice found that its clear implication called for State Land to account

to Alper therefor. The receiver does not seriously question that finding.[2]

On July 3, 1967, only 12 days after the conveyance by Alper to State Land, a stockholder instituted receivership proceedings against Alper, and first a temporary and then a permanent receiver were appointed. The institution of those proceedings apparently in no way affected State Land's possession of the property previously deeded to it by Alper, and it continued to hold title until the fall of 1967. Then, in conjunction with the receiver, who was selling contiguous property owned by Alper, it sold the premises at public auction and, at the closing on December 27, 1967, received a net, after expenses, of $46,810.29. By agreement the proceeds were turned over to the receiver and the attorney for State Land Company to be held in escrow by them pending determination of the claims which were being made against the fund by State Land, the receiver, and Belilove. To obtain that determination, the receiver petitioned the receivership court for instructions on how to distribute. A summary proceeding followed. Nobody questioned State Land's right to be paid the balance of $24,917.02 which was due on its mortgage. Belilove, claiming under the June 29, 1966 memorandum-agreement with Alper relating to his fees, asserted his right to one-half of the difference between the sale price and the mortgage indebtedness. The receiver took issue with Belilove and claimed everything in excess of what was owed on the mortgage. In resolving the conflict between Belilove and the receiver, the trial justice adopted the former's interpretation of the June 29, 1966 agreement, and he directed

_____

[2]In his brief the receiver says "The June 21, 1967 agreement is silent on the distribution of sale proceeds in excess of those required under the State Land Company, Inc. mortgage and under the June 29, 1966 agreement with Mr. Belilove. It is obvious, however, that such surplus would inure to M. S. Alper & Sons, Inc. Mr. Belilove so testified (transcript, page 20) and the Superior Court so found (Opinion, page 10)."

that the fee claimed by Belilove should be paid and that the balance of the escrowed funds should be turned over to the receiver. The receiver promptly appealed. Shortly thereafter, apparently being in some doubt about his right to seek review without having first obtained the appointing court's permission, the receiver applied for such permission, and received its *nunc pro tunc* approval to the appeal he had already claimed.

Initially, there is the procedural question of the receiver's right to appeal. It was raised by Belilove who, in a motion to dismiss the appeal filed shortly after the case was docketed here, advanced two grounds. First, and primarily, he urged that the receiver had no proper interest in disputing the positive instructions he had received from the court which had appointed him and subject to whose directions he was required to act. Secondly, he questioned whether the order appealed from possessed a sufficient degree of finality to permit immediate review. We denied his motion without prejudice. 104 R. I. 735, 248 A.2d 603. He renewed it when the case was argued and we consider it now.

It is, of course, basic in receivership law that a receiver does not have an absolute right of appeal, and that generally he will not be allowed to appeal an order of the court whose instrumentality he is and by whose creation he exists except upon its express permission and direction. *McKenzie* v. *Standard Bleachery Co.,* 109 N. J. Eq. 429, 157 A. 845; *Stowell* v. *Arizona Sav. & Loan Ass'n,* 93 Ariz. 310, 380 P.2d 606; *Hatten* v. *Vose,* 156 F.2d 464; *Hicks* v. *First Nat. Bank,* 224 Ala. 494, 140 So. 882. Whether the appointing court should give such permission in some states is said to be discretionary. *Beilman* v. *Poe,* 120 Md. 444, 88 A. 131; see *Schultz* v. *City of Cincinnati,* 8 Ohio App. 140, *aff'd City of Cincinnati* v. *Schultz,* 97 Ohio St. 317, 120 N. E. 176. Other courts look at the circumstances of each

case. Generally they say that permission should be given when the order sought to be reviewed, if allowed to stand, would diminish the funds otherwise available for distribution to the creditors. *Felton* v. *Ackerman,* 61 F. 225; *Kavanagh* v. *Bank of America,* 239 Ill. 404, 88 N. E. 171.

In this case, it is not essential that we decide which of the two approaches to take. Under either, it was not error to grant permission. The legal issues raised by the petition for instructions, if not complex, are at least to some extent novel in this jurisdiction. This alone would justify an exercise of discretion in favor of permitting review. Moreover, the trial justice was obviously aware that a disagreement by this court with his resolution of what was at issue would result in a substantial increase in the receivership assets. These considerations were more than sufficient as bases for the appointing court to grant the receiver leave to appeal. It is of no significance, moreover, that the receiver's request for permission, rather than being antecedent to his claim of appeal, followed it by 13 days.

Belilove also argues that the order appealed from was not final in its nature and was therefore not appealable. That argument may be tested by inquiring whether an appeal would lie if the receiver, instead of having proceeded within the receivership proceedings, had litigated his claim to the escrowed funds by commencing an independent action for an accounting of the proceeds of the sale of the Alper property. This, of course, he could have done. *Roberts* v. *Golden Flake Doughnut Shops, Inc.,* 53 R. I. 465, 467-468, 167 A. 259, 260. An adverse judgment in such a proceeding obviously would have been a final adjudication which would have been immediately appealable. The result should be no different because the receiver, instead of proceeding by an independent action, elected instead to seek a summary disposition within the receivership proceedings. That the order which entered was not a final dis-

position of the entire receivership proceedings in no way detracts from its being a final adjudication of the conflicting claims to the proceeds of the property deeded by Alper to State Land on June 21, 1967. Clearly, it determined the merits of a controversy upon a distinct or separate division of the entire receivership matter, and therefore it had the degree of finality necessary to qualify for immediate review. *Albanese* v. *Cashman,* 66 R. I. 475, 20 A.2d 256; *Edwards* v. *Miller,* 47 R. I. 235, 132 A. 609.

An additional threshold question concerns the interpretation of the memorandum-agreement of June 29, 1966, between Alper and Belilove. That agreement, it will be recalled, was entered into when Belilove arranged for State Land to provide the financing which enabled Alper to purchase the land from the state. That agreement is concerned with how Belilove's fee should be determined and when it should be paid. It commences with the recital that the parties recognize Alper's inability to pay Belilove for the services he had rendered in connection with the acquisition of the land taken by the state from Alper and later found to be in excess of its highway needs, and then it further recites their expectation that payment will be made if and when Alper sells or otherwise disposes of the property. The reason for and the purpose of the agreement having been thus stated, the agreement then continues and initially provides:

> "NOW, THEREFORE, it is agreed that payment for legal services rendered by said Belilove will be computed by one-half of the difference between the sale price of said real estate so repurchased and $21,862.00."

The agreement in its second provision looks to what will happen if the property is not sold within one year and it provides that in such an eventuality Belilove will receive a minimum fee of $4,000, half to be paid on or before the end of the year and the balance within two years. And the last provision says that if the property is leased rather

than sold the fee shall be one-half of the difference between the appraised value of such lease and $21,862, but in no event less than $4,000.

In interpreting that instrument it is basic that the intention of the parties must govern if that intention can be clearly inferred from its terms and can be fairly carried out consistent with settled rules of law. *Hatch* v. *Sallinger,* 47 R. I. 395, 133 A. 621; *Newport Water Works* v. *Taylor,* 34 R. I. 478, 83 A. 833; *Reynolds* v. *Washington Real Estate Co.,* 23 R. I. 197, 49 A. 707; *Anthony* v. *Comstock,* 1 R. I. 454. In ascertaining what the intent is we must look at the instrument as a whole and not at some detached portion thereof. *Shuster* v. *Sion,* 86 R. I. 431, 136 A.2d 611. And, although there is no ambiguity, we will nonetheless consider the situation of the parties and the accompanying circumstances at the time the contract was entered into, not for the purpose of modifying or enlarging or curtailing its terms, but to aid in the interpretive process and to assist in determining its meaning. Restatement of Contracts §235(d); see *Swinburne* v. *Swinburne,* 36 R. I. 255, 90 A. 121; *Wesley* v. *M. N. Cartier & Sons,* 30 R. I. 403, 75 A. 626; *Deblois* v. *Earle,* 7 R. I. 26. If, after applying those and the other established standards of interpretation, the meaning still remains uncertain, we will prefer an interpretation which gives a reasonable, lawful and effective meaning to all manifestations of intention, rather than one which leaves a part of those manifestations unreasonable, unlawful or no effect. Restatement of Contracts §236(a); see *Wall & Co.* v. *Imperial Printing & Finishing Co.,* 165 A. 898 (R. I.); *Gross* v. *Clark,* 43 R. I. 389, 113 A. 115.

As in most cases involving the interpretation of writings, the problem is not with the standards, but with their application. Belilove relies on the initial provision which says that his fee shall be one-half of the difference between the sale price of the property and $21,862. The yardstick

established by that provision is "the sale price of said real estate," and he says that it should be applied irrespective of when the property was sold or who may have sold it. In this case, he says, the amount of his fee was determined, and his right to be paid accrued when the property was sold at auction. The receiver, on the other hand, argues that the three provisions of the agreement established mutually exclusive methods for determining the fee, and that Belilove, if entitled to be paid under one provision, cannot claim something in addition under another. Under his theory, Belilove's claim falls under the second provision since the sale was consummated more than one year after the date of agreement. Accordingly, he rules out any claim under the first provision, and he limits Belilove, even though the property was sold, to the $4,000 stipulated in the second provision as a minimum fee in the event the property was not sold within one year.

The trial justice rejected the receiver's approach and accepted Belilove's. In our judgment he was correct. At the root of the fee agreement was Alper's recognition that Belilove had toiled laboriously, skillfully, and successfully on its behalf for six years. That he had not been paid was attributable to Alper's inability to pay, rather than to a desire to avoid honoring a just obligation. Alper was quite willing to make some arrangement whereby Belilove would be paid. That willingness was demonstrated when it acquired the property from the state. It was then that it appointed Belilove its attorney in fact to sell the property. Simultaneously, a memorandum-agreement was executed which provided how his compensation should be computed and when it should be paid. In the first sentence of the body of that agreement it is provided that the fee will be "* * * one-half of the difference between the sale price of said real estate so repurchased and $21,862.00." It is true that this provision does not specifically state or spell

out in so many words that the fee thus set will not be due if the sale occurs more than one year later or if the sale, instead of being made by Alper, is made by the mortgagee. The receiver argues that this lack of specificity is significant as revealing intention, but clearly the situation of the parties and the accompanying circumstances at the time the writing was executed vitiate that argument and make it abundantly evident that the parties contemplated that the fee set in the first provision would be due regardless of when and by whom the sale might be consummated so long as the proceeds were available directly or indirectly to Alper.

What is important is to look at the general background which gave rise to the agreement. Once that is done, the several provisions, when read together, and not as detached portions of a single writing, fall naturally into place. The first provides for a method whereby the fee will be computed in the event of a sale; the second sets $4,000 as the minimum fee which will be paid if no sale is made within the first year. The latter neither limits nor restricts the former. Instead, it merely prescribes what will be paid if a sale is not made within a stipulated time. The rationale underlying the two provisions is quite obvious. Belilove, notwithstanding his several years of labor, had not been paid, and while he was willing to set no minimum if he were paid seasonably, viz., within one year, he was unwilling to wait indefinitely for a sum which was contingent on what the property might bring at some unknown and unascertainable time in the future. The circumstances and situations, therefore, suggested not only that he receive some part of the proceeds of any sale, whenever it might occur, but that if forced to wait an indefinite time he be paid something on account within a reasonable time.

The final provision causes no difficulty since it obviously covers the contingency of what the fee would be if the property were leased rather than sold.

We turn now to the various contentions the receiver advances in contesting Belilove's right to be paid in full, and in seeking to relegate him to the status of an unsecured creditor entitled only to whatever dividend will be paid general unsecured creditors. We start with the agreement of June 21, 1967, in which, as we have already related, State Land agreed to satisfy Alper's obligations to Belilove out of the excess proceeds of the sale of the Alper property. The receiver does not dispute that this was a third-party creditor-beneficiary contract. Nonetheless, he takes the position that he, as Alper's permanent receiver, can, even without Belilove's consent, discharge State Land from its obligation to pay Belilove whatever may be due him under that agreement. To support that position he relies on the Restatement of Contracts §143 which reads:

> "A discharge of the promisor by the promisee in a contract or a variation thereof by them is effective against a creditor beneficiary if,
>
> (a) the creditor beneficiary does not bring suit upon the promise or otherwise materially change his position in reliance thereon before he knows of the discharge or variation, and
>
> (b) the promisee's action is not a fraud on creditors."

The question is whether application of the Restatement rule will permit the receiver to discharge State Land from its obligation to pay Belilove his fee for services. For the answer we look to the facts. The evidence is that Belilove arranged for the conveyance of the property from Alper to State Land; that he was the draftsman of the documents incident to the Alper-State Land transactions; that he realized that once title left Alper he would no longer be able to act under the power of attorney of June 29, 1966, which gave him the right to sell or otherwise to dispose of the property and thereby to acquire the cash to pay his fee; and that he accepted the new arrangement between Alper and State Land, and assented to its terms. Without

that accession, he would not now be in a position to insist upon the performance by State Land of its promise to pay his fee and the receiver would be in a position to discharge State Land of its obligations in that regard. *Blake* v. *Atlantic National Bank,* 33 R. I. 464, 82 A. 225; *Wood* v. *Moriarty,* 16 R. I. 201, 14 A. 855. But he did accede to the new arrangement and he did so prior to the receivership. That accession in conjunction with the other circumstances surrounding the transaction justified the trial justice in concluding that Belilove had materially changed his position in reliance upon State Land's promise. Under the Restatement rule, that material change of position precludes the receiver from effectively discharging State Land from its obligation to Belilove.

As an alternative argument, the receiver urges that the conveyance by Alper to State Land Company was fraudulent and therefore void. In advancing this contention he does not attack the trial justice's explicit factual determination that Alper had no intention to hinder, defraud or delay its creditors, that it conveyed to State Land for an adequate consideration, and that it acted in good faith. He readily concedes, however, that these findings would be significant, and even determinative, were this a case calling for the application of our customary rule which assigns to the fact-finder the question of the existence or non-existence of fraud. *Robinson* v. *McKenna,* 21 R. I. 117, 42 A. 510. His argument, as we understand it, is that it makes no difference to him whether Alper's intentions were honest or fraudulent. Creditors were defrauded, he says, not because of bad intentions, but because the June 21, 1967 conveyance to State Land, although absolute on its face, was accompanied by a secret reservation for Alper's benefit. He then goes on to say that the inevitable and necessary consequence of such a transaction was to defraud creditors, and he concludes with the statement that in

such circumstances fraud exists as a matter of law, and intention has no relevance.

The receiver relies on *Bellini* v. *Neas,* 50 R. I. 283, 146 A. 634. In that case a vendor by a deed, absolute on its face, conveyed a parcel of real estate to a creditor for $27,297. The price was fair and it was paid by (1) the assumption by the purchaser of a $15,000 mortgage; (2) the cancellation of the vendor's note which then had a balance due of $11,000 plus; and (3) the payment of $550 in cash. In addition, and in order to make up the balance of the purchase price, the parties secretly agreed to permit the vendor to occupy the premises and to cultivate the land, rent-free, for two years. The court found that transfer obnoxious to the statute against fraudulent conveyances. It reasoned that the vendor had placed valuable property beyond the reach of his creditors by secretly reserving to himself the beneficial enjoyment of what rightfully belonged to those who had extended him credit on the strength of his ownership interest in the property subsequently conveyed.

What principally distinguishes *Bellini* from this case is the nature of the secret reservation. In *Bellini* what was reserved was the right of the vendor to occupy the premises and to have the privilege of cultivating them rent-free for two years. That was a privilege which in 1925 the parties valued at $720, and it was, of course, for the vendor's sole and exclusive benefit. To the extent that it conferred a benefit upon him, it was placed beyond the reach of his creditors; and to the extent that it was secret, it deprived those creditors, without their knowledge, of an opportunity to reach what rightfully belonged to them.

In this case, however, what the receiver relies on as a "secret reservation" are those provisions of the June 21, 1967 agreement which delineated what State Land was to do with the proceeds of the land sale. Clearly, as we have already stated, they were to be applied first in satisfaction

of the mortgage indebtedness; then in discharge of Alper's obligation to Belilove; and any balance was to be paid to Alper and thereby become available to its creditors. In these circumstances it cannot be said that the conveyance of June 21, 1967, plus the accompanying agreement, secretly reserved any benefit to Alper or placed it beyond the reach of Alper's creditors. Instead of defrauding them, the entire transaction was purposed upon obtaining a larger purchase price for the property than could be anticipated if the threatened foreclosure sale had been allowed to take place. The essential purpose was to assist, rather than to defraud, creditors. We are satisfied that the *Bellini* case is clearly distinguishable and that the June 21, 1967 transaction between Alper and State Land was not fraudulent as a matter of law.

As is to be expected, the receiver also raises the question of whether payment in full to Belilove can be avoided on preference grounds. To support that position he urges first that the provision of the Rhode Island Insolvency Act[3] permitting the avoidance of preferential transfers has not been suspended by the bankruptcy act. While he makes that claim, he acknowledges, as of course he must, that this court has decided that the enactment of a bankruptcy act by the Congress *ipso facto* suspended and abrogated state legislation on the same subject. *In re Burke*, 25 R. I.

---

[3]The Rhode Island Insolvency Act, while it has earlier antecedents, was enacted by P. L. 1908, ch. 1577. It is set out in full in G. L. 1923, ch. 390, and referred to in G. L. 1938, ch. 594 together with the following notation:

"The revisers of the General Laws of 1938 have concluded to omit this chapter from that revision because, in their opinion. its provisions have been entirely superseded and its operations suspended by the federal Bankruptcy Act.

"*However,* this is not to be taken or construed as a repealer of such chapter; it is still to be deemed to be in force and effect as found in the General Laws of 1923."

The only reference in the 1956 revision is found in §43-4-15 which provides that "Chapter 390 of the general laws of 1923 is still to be deemed to be in force and effect as found in the general laws of 1923."

302, 55 A. 825; *In re Reynolds,* 8 R. I. 485. He argues, however, that *Lace* v. *Smith,* 34 R. I. 1, 82 A. 268, overruled or at least modified the broad sweep of *Burke* where our court said at 303, 55 A. at 826: "If the statute as a whole cannot be applied to a case within the purview of the bankrupt act, we see no reason why certain provisions should be picked out of it and applied to a case under another statute."

In *Lace* v. *Smith, supra,* where he puts his reliance, a fraudulent conveyance or preferential transfer was set aside by an assignee in insolvency proceedings under the state law. The principle the receiver seeks to derive and to apply here is that the rule of suspension is flexible, rather than absolute; and that it should be relaxed here so as to permit the insolvency law to be invoked as a means of avoiding the transfer made at least in part for Belilove's benefit.

The fallacy with his argument is that it rests upon a faulty premise. *Lace* v. *Smith, supra,* in no way impinges upon the rule of suspension announced in *Reynolds* and followed in *Burke.* True, we applied our own insolvency law even though a bankruptcy act was then in effect, but we applied it in a proceeding which originated as an involuntary petition against a person who was engaged chiefly in farming or the tillage of the soil. Such a person was then expressly excepted and exempted from the provisions of the bankruptcy act, and there was therefore no conflict between the state and the federal acts in respect to the insolvent. *Lace* v. *Smith, supra,* is not authority for the rule that the bankruptcy act does not override conflicting state insolvency laws and lends no support to the receiver.

Primarily, however, his argument is that the bankruptcy provisions for setting aside preferential transfers are or should be applicable in state court equity receiverships, and for that proposition he relies upon *Leonard Levin Co.*

v. *Star Jewelry Co.,* 54 R. I. 465, 175 A. 651. The question
in that case had to do with how the receivership court
should rank the claim of a wage earner. In holding that
it was entitled to the same priority in payment provided
for by the bankruptcy act, we did not decide that the bank-
ruptcy act or any of its provisions were binding upon a
receivership court. Instead, we recognized that we had no
statute regulating the ranking of debts, and in order to
carry out the essential task of establishing the relative
priority in payment to be accorded various types of claim-
ants, we borrowed from the bankruptcy act what to us
seemed a fair and equitable rule for determining how in
the distributive process to consider the claim of a wage
earner. That, in the language of the trial justice, "is a far
cry" from using the bankruptcy act as a springboard for
avoiding a transfer otherwise permitted under our state
law. *Faiella* v. *Tortolani,* 76 R. I. 488, 72 A.2d 434; *W. W.
Coates & Co.* v. *Wilson,* 20 R. I. 106, 37 A. 537; *Perkins* v.
*Hutchinson,* 17 R. I. 450, 22 A. 1111. While avoidance of
a preference is a right clearly available to a trustee in bank-
ruptcy, nothing in our law, save for what has been sus-
pended, extends that right to the receiver of an insolvent
corporation.

Finally the receiver says that Belilove failed to comply
with those provisions of the Uniform Commercial Code
which require that a financing statement be filed if a
security interest is to be perfected, and he asserts that
Belilove's non-compliance in this case defeats his claim to
be paid in full out of the proceeds of the sale. What de-
feats this assertion, as the trial justice pointed out in his
rescript, is that it is premised upon the erroneous concep-
tion that Belilove is urging a secured claim against receiver-
ship assets, and that, of course, is just not so. State Land
acquired title to Alper's land on June 21, 1967, and simul-
taneously agreed that it would, after liquidating its own
claim, pay Belilove whatever was due him under his fee

agreement with Alper. Once the sale was made State Land was obligated to carry out that undertaking and, for reasons referred to in our discussion of third-party creditor-beneficiary contracts, its promise to pay Belilove could not be rescinded by the receiver. Belilove does not now insist upon payment of his claim out of the receivership assets, but only that State Land fulfill its contractual obligation to him. In our judgment the receiver has not presented any issue which involves provisions of the Uniform Commercial Code.

For the reasons indicated the receiver's appeal is denied and dismissed.

*Edwin O. Halpert* and *Samuel A. Olevson,* for permanent receiver of M. S. Alper & Sons, Inc., appellant.

*Arcaro, Belilove & Kolodney, Samuel J. Kolodney*, for State Land Company, Inc. and Abraham Belilove, appellees.