DECISION
In this civil action, UST Corporation (UST) asserts a claim for breach of contract against General Road Trucking Corporation (General Road) and Coventry Sand Gravel, Inc. (CSG, Inc.). Additionally, UST asserts claims for tortious interference with a contractual relationship and negligence against Joseph D. Anthony (Anthony). CSG, Inc. asserts counterclaims for breach of contract and negligence against UST.
The Superior Court issued an Order granting Partial Summary Judgment against CSG, Inc. as to Count Two of the Complaint pursuant to Super. Ct. R. Civ. P. Rule 56. The remaining matters have been heard before this Court in a nonjury trial, after which the parties submitted post-trial memoranda and presented post-trial oral arguments.
The defendants, General Road and Anthony, have filed a post-trial Motion to Dismiss pursuant to Super. Ct. R. Civ. P. Rule 41 (b)(2). The September 5, 1995 amendment to Rule 41 (b)(2) deleted "the language authorizing the defendant in a nonjury action to move for dismissal at the close of plaintiff's evidence on the ground of the plaintiff's failure to establish a right to relief." Super. Ct. R. Civ. P. Rule 41, Committee Notes. The proper motion to make in order to obtain this relief is pursuant to Super. Ct. R. Civ. P. Rule 52 (c). The defendants did not submit their motion at the close of plaintiff's case; rather they submitted the motion post-trial. The Court finds defendant's motion untimely, and thus denies the motion.
 FACTS AND TRAVEL
After review of all the evidence and consideration of the arguments presented in post-trial memoranda and oral argument, this Court makes the following findings. In April 1986, Robert W. Mancini (Mancini) formed UST, a corporation organized under the laws of the State of Rhode Island. UST provides consultation and remediation services for the removal and disposal of underground storage tanks and petroleum contaminated soil. Mancini is the President of UST and manages the day to day operations of the business.
The defendant, General Road, is a corporation organized under the laws of the State of Rhode Island with a principal place of business located in East Providence, Rhode Island. General Road owns a stone crushing and asphalt processing facility located in Coventry, Rhode Island. General Road operates this facility under the fictitious business name of Coventry Sand and Gravel. The defendant, Anthony, is the President of General Road and is in charge of managing the day to day operations of the business.
The defendant, CSG, Inc., is a corporation organized under the laws of the State of Rhode Island with its principal place of business located at the General Road site in Coventry, Rhode Island. CSG, Inc. was incorporated on February 1, 1985 with the purpose of providing general contracting services for the excavating and removal of sand, gravel, asphalt and stone. CSG, Inc. does not maintain corporate books and does not have any named shareholder(s) of record. CSG, Inc. has, however, filed Annual Reports with the Office of the Secretary of State from 1986 to 1998. These Annual Reports indicate the following: 1) that from 1985 to 1991 Charles D. Anthony was the President and Secretary and James P. Anthony was the Vice President and Treasurer; 2) that in 1992, E. Irene Anthony became the Vice President and Treasurer; and 3) that in 1993, Anthony became the President and Treasurer and E. Irene Anthony became the Secretary. Although Anthony and James P. Anthony testified that CSG, Inc. has no named shareholders, the uncontroverted evidence is that two hundred common shares were issued and Anthony and General Road are the owners of CSG, Inc. See Katz v. Prete,459 A.2d 81 (R.I. 1983) (The "issuance and delivery of stock certificates are not essential to establish ownership, which may be inferred from the acts and conduct of a party. (citations omitted)."). Moreover, Anthony at all times relevant to this action was authorized by the corporate officers to manage the day to day operations of the business and act on behalf of the corporation. UST has not presented sufficient evidence for this Court to find that this delegation of power by the corporate officers to Anthony was improper or invalid. See Fournier v.Fournier, 479 A.2d 708, 712-714 (R.I. 1984) (Closely held corporations may transact business informally.).
In 1986, Mancini and Anthony discussed the proposition of forming a joint venture in order to provide consultation and remediation services for the removal and disposal of underground storage tanks and the processing of petroleum contaminated soil into asphalt. Under this joint venture, UST would provide the technical knowledge, management ability, and regulatory understanding in order to assist CSG, Inc. in applying for a Department of Environmental Management (DEM) Solid Waste Management License (license). Additionally, UST would be responsible for managing the pre-production processing of the petroleum contaminated soil. In accordance with the agreement, CSG, Inc. was to provide the labor and equipment for the petroleum contaminated soil processing facility and would utilize the processed soil in the manufacture of asphalt and land fill product.
In July 1987, Mancini drafted a written agreement entitled "Exclusive Management Agreement." This agreement was executed by Mancini and Anthony and amended on June 8, 1988 (collectively Management Agreement), on behalf of UST and CSG, Inc., respectively. After thorough consideration of the Management Agreement "in its entirety," and after giving the "words their plain, ordinary, and usual meaning" the Court finds that the terms and conditions of the Management Agreement are clear and unambiguous.[1] Johnson v. Western Nat. Life Ins., 641 A.2d 47, 48 (R.I. 1994).
From 1987 to 1988, UST prepared a Solid Waste Management License Application (license application) on behalf of Coventry Sand and Gravel and submitted the same to the DEM, Division of Air and Hazardous Materials.[2] On July 19, 1990, the DEM issued a license to Coventry Sand and Gravel to operate a petroleum contaminated soil, solid waste management facility. This facility was known as the Coventry Sand and Gravel Petroleum Contaminated Soil Processing Facility (processing facility), and was located on Airport Road, in Coventry, Rhode Island.[3] The license was for a period of one year and was subject to Coventry Sand and Gravel, meeting conditions stated in the license regarding an alternate disposal site and proof of financial assurance. The license provided that Coventry Sand and Gravel "shall construct and operate this soil processing facility in accordance with plans and procedures as described in the final approved application." CSG, Inc. and UST began operating the processing facility in October 1990 after meeting these conditions.[4] Renewal of the license by DEM was conditioned upon the purchase and installation of equipment upgrades at the processing facility.
The relevant duties and responsibilities of the parties as stated in the license application are clear and unambiguous and not in dispute between the parties. UST, as the operating manager, was exclusively responsible for providing an agent at the processing facility in order to schedule contaminated soil deliveries, and to receive, inspect, sample, and analyze the contaminated soil arriving at the processing facility so as to ensure that the DEM requirements were being met. These requirements included not receiving soil contaminated with hazardous materials or storing more than seventeen hundred tons of unprocessed contaminated soil on site at any given time. Although, pursuant to the license, Coventry Sand and Gravel had authority to operate the processing facility with UST as the operating manager, under the Management Agreement, CSG, Inc. was responsible for processing the contaminated soil and for distributing the processed soil. UST has not submitted sufficient evidence that the license prevented Coventry Sand and Gravel from delegating its duties under the license to CSG, Inc.
From October 1990 to January 1991, UST and CSG, Inc. processed contaminated soil at the processing facility. Pursuant to the Management Agreement, UST and CSG, Inc. shared the gross revenue generated from the contaminated soil processing contracts. UST collected the revenue, retained forty percent, and then disbursed the remaining sixty percent to CSG, Inc. This Court takes notice that UST did not always pay a sixty percent share to CSG, Inc. At certain times UST paid monies to other named entities as agreed to by the parties. Those entities being Coventry Paving Corp. and General Road Trucking Corp. Moreover, UST did not always receive the gross revenue from the processing contracts, but rather, the contracting parties paid an entity named C S G Reclamation. The Court finds that although various business entities were involved in the assignment of monies, UST has not provided any evidence that these entities were actual or intended parties to the Management Agreement.
In January 1991, Anthony had discussions with a general contracting company, Taraco, Inc. (Taraco), regarding the processing of contaminated soil from the Providence Convention Center construction site. Although there is much conflicting testimony surrounding these events, the Court finds that Anthony did discuss with Mancini the details concerning the agreement with Taraco. Mancini's only reservation was to "watch the money." At some time later, Anthony made an agreement with Taraco to have the contaminated soil transported to the processing facility. This activity was scheduled to commence the week of January 21, 1991.
UST has not submitted sufficient evidence for this Court to find that it was uninformed about the shipments from Taraco. Moreover, the Court finds that an agent of UST — the operating manager — was present at the processing facility when the deliveries from Taraco arrived on site. Due to a breakdown in communication between UST and CSG, Inc., the soil received from Taraco was not tested and analyzed by UST in order to ensure that DEM requirements were met. However, regardless of the communication breakdown, UST maintained exclusive responsibility to provide an operating manager at the processing facility in order to perform the required duties under the license and Management Agreement, and to document that all DEM requirements were met.
From these Taraco deliveries, CSG, Inc. received total revenue of $378,120.00.[5] However, UST's forty percent share of this amount was not disbursed by CSG, Inc. to UST.[6]
Mancini informed DEM of the alleged license violations resulting from UST's failure to fulfill its exclusive responsibility with regards to soil deliveries from Taraco. DEM issued to Coventry Sand and Gravel a Notice of Intent to revoke the license. Coventry Sand and Gravel did not file an appeal and DEM revoked the license. Although UST was the operating manager of the processing facility, it ceased all contact with CSG, Inc. and did not fulfill its responsibilities under the Management Agreement or the license. UST has presented no evidence that it approached CSG, Inc. to mitigate any potential damage from the breakdown in the business relationship or to resolve the alleged DEM violations as a result of the handling of the Taraco shipments by CSG, Inc.
 GENERAL ROAD IS NOT A PARTY TO THE MANAGEMENT AGREEMENT
This jurisdiction has "long held that `parties are bound by the plain terms of their contract.'" Vincent Co. v. First Nat.Supermarkets. Inc., 683 A.2d 361, 363 (R.I. 1986) (quoting Hillerv. Submarine Signal Co., 325 Mass. 546, 550, 91 N.E.2d 667, 669 (1950)). "The main objective of the [C]ourt when construing contract terms is to determine the intent of the parties."Johnson v. Western Nat. Life Ins., Co., supra. (citations omitted). The Court will enforce the intentions of the parties as manifested in the terms of the contract if those "intention[s] can be clearly inferred from [the contract] terms and can be fairly carried out consistent with settled rules of law." Hill v.M.S. Alper Son, Inc., 106 R.I. 38, 47, 256 A.2d 10, 15 (1969) (citations omitted). Moreover, the Court "must find that a contract is ambiguous before it can exercise judicial construction of the document. If the [C]ourt finds that the terms of an agreement are clear and unambiguous, the task of judicial construction is at an end and the agreement must be applied as written." W.P. Associates v. Forcier, Inc., 637 A.2d 353, 356 (R.I. 1994).
For the factual reasons stated above, this Court finds that the terms of the Management Agreement are clear and unambiguous. The Management Agreement neither contains language stating that General Road was a party to the Management Agreement, nor does it contain language that UST intended to hold another entity other than CSG, Inc. responsible for performance thereof. Moreover, UST has not submitted sufficient evidence for this Court to find that General Road was the party actually performing the responsibilities of CSG, Inc. under the Management Agreement or that General Road ratified the Management Agreement and accepted liability for performance under its terms. Anthony signed the Management Agreement as President of CSG, Inc. He had authority to do so by the Board of Directors. CSG, Inc. is the party that UST contracted with, and is thus the only party liable for the breach of that contract. Therefore, UST's claim for breach of contract against General Road is denied.
 ANTHONY DID NOT INTENTIONALLY AND MALICIOUSLY INTERFERE WITH THE CONTRACTUAL RELATIONSHIP
In order to recover under the claim of intentional and malicious interference with a contractual relationship, the plaintiff must prove: "(1) the existence of a contract; (2) the alleged wrongdoers knowledge of the contract; (3) his intentional interference; and (4) damages resulting therefrom. The burden of proving sufficient justification for interference is upon the defendant." Smith Development Corp. v. Bilow Enterprises, Inc.,308 A.2d 477, 482 (R.I. 1973) (citations omitted).
While the evidence is clear that there was a written contract between UST and CSG, Inc., and that Anthony had knowledge of the contract, UST has not presented sufficient evidence for this Court to find that Anthony intentionally or maliciously interfered with the contractual relationship. Anthony negotiated an agreement with Taraco to process contaminated soil from the Providence Convention Center construction site and he discussed this agreement with Mancini. UST has presented no evidence demonstrating that Anthony entered into this agreement with Taraco or executed its terms with legal malice. Mancini's only concern, with respect to this agreement, was receiving payment from Taraco. Mancini did not object to the transporting, receiving, and processing of contaminated soil from the Providence Covention Center construction site.
Furthermore, pursuant to the Management Agreement and the license, UST maintained exclusive management responsibility for meeting regulatory requirements, and documentation thereof, in the transporting, testing, and receiving of contaminated soil in the pre-production stage. Therefore, the Court finds that Anthony did not intentionally or maliciously interfere with the Management Agreement, and thus denies this claim.
 ANTHONY WAS NOT NEGLIGENT
UST has presented no evidence that Anthony, in his individual capacity, breached a duty to UST in performing his duties as an agent for CSG, Inc. At all times relevant hereto, UST maintained the duty which they claimed was breached by CSG, Inc. and Anthony — to inspect and analyze contaminated soil arriving at the processing facility. As such, the Court finds that Anthony was not negligent, and thus this claim is denied.
 LOST PROFITS ARE DENIED
"The basic requirement for the recovery of loss of profit is that such loss must be established with reasonable certainty."Smith Development Corp. v. Bilow Enterprises, Inc., supra. at 482 (citation omitted). The proof required to establish "`reasonable certainty of profits must depend in a large measure upon the circumstances of the particular case and thus will escape the hard and fast rules of general applicability.'" Id. (citing 64 Harv. L. Rev. 317, 318-19 (1950)). The lost profit calculations presented by UST's expert were based on many unsupported and speculative assumptions.
UST assumed that the parties would make the required capital upgrades in the equipment at the processing facility and apply to DEM, by July 1991, in order to renew the license. UST has neither submitted sufficient evidence demonstrating that the parties were reasonably certain to make these upgrades nor has it submitted sufficient evidence allowing this Court to find that the parties were reasonably certain to continue this joint venture beyond July 1991.
Additionally, UST's revenue projections were based upon the processing facility operating at one hundred tons per hour. This calculation was speculative at best as UST's expert neither physically examined the equipment at the processing facility nor did he present a logical method as to how he calculated this figure. The evidence indicates that the actual output capacity of the equipment was closer to twenty-five tons per hour because of the age of the equipment. Although UST's expert took this fact into consideration, he arbitrarily reduced the stated maximum output rather than base an estimate on the actual capacity of the equipment at the time of the breach.
In addition to speculating on the maximum output of the processing facility, UST's projections, concerning available tonnage of contaminated soil that would have been processed at the processing facility over the maximum life of the Management Agreement, are purely speculative and are not based upon any rational calculations. Although UST has presented lists of potential sites that contained contaminated soil in the Commonwealth of Massachusetts, these lists do not contain any information as to the amount of contaminated soil present per site. Furthermore, UST has not presented any credible evidence in order to support a reasonable conclusion that it would have received contracts for contaminated soil remediation with these landowners. Although UST presented speculative testimony on the size of the total contaminated soil remediation market in the Commonwealth of Massachusetts and the State of Rhode Island, UST failed to present any rational calculations in order for this Court to logically estimate UST's share of this "market" with reasonable certainty. As such, this Court is unable to calculate a lost profit figure with reasonable certainty.
Finally, this Court notes that the joint venture was only operating for approximately three months at the time of the Taraco agreement. UST has presented very limited historical data on the profitability of its business with CSG, Inc. Although UST was an expert in the contaminated soil remediation business and continued operations up to and including the time of this trial, it did not present any actual data concerning its revenue and expenses from the time of breach until the time of trial, but rather UST used projections for these amounts. Unsupported and self-serving projections in the place of actual data, when available, neither will allow this Court to hold that UST's calculations were based on rational standards, nor will they support assertions of lost profits with a reasonable degree of certainty. Therefore, this Court denies UST's claim for lost profits.
 UST BREACHED THE MANAGEMENT AGREEMENT
CSG, Inc. has presented uncontroverted evidence that UST has not disbursed $47,000.00 due under the terms of the Management Agreement for contaminated soil received prior to the aforementioned breach, UST has presented no evidence to rebut this allegation. Therefore, this Court finds damages in the amount of $47,000.00 in favor of CSG, Inc.
 CONCLUSION
From the above findings of fact and conclusions of law, judgment shall enter in favor of UST against CSG, Inc. in the amount of $151,248.00 (40% of $378,120.00) plus interest and costs. Judgment shall also enter in favor of CSG, Inc. against UST in the amount of $47,000.00 plus interest and costs on its counterclaim.
Counsel shall prepare and submit an appropriate Order for entry of judgment in accordance herewith, within 10 days.
[1] Anthony signed this Management Agreement as President of CSG, Inc. Although Anthony was not the President of CSG, Inc. until 1993, he did have authorization from the corporate officers to execute the agreement and to bind the corporation. The language of the Management Agreement is clear and unambiguous that this contract was made between UST and CSG, Inc. No other party is named or referenced in the Management Agreement. Moreover, the amendment corrected the name of UST because in the original agreement UST was erroneously named UST Management, Inc. The parties did not change the name of CSG, Inc. in the amendment. UST has not submitted sufficient evidence for this Court to find that the principals erred in naming UST and CSG, Inc. as the parties to the Management Agreement. Wholey BoilerWorks v. Lewis, 45 R.I. 441, 123 A. 595 (1924).
[2] This license application was not submitted in the name of CSG, Inc. but rather in the name of Coventry Sand and Gravel, the fictitious business name of General Road.
[3] The license application named the operating company as General Road Trucking Corporation DBA Coventry Sand and Gravel, and named the owner of the real property where the processing facility was located as Joseph D. Anthony.
[4] The processing facility was operated for approximately seven hours per day, and due to the age of the equipment had a soil processing capacity of approximately twenty-five tons per hour. Additionally, UST has not submitted sufficient evidence for this Court to find that General Road, as opposed to CSG, Inc., was operating the processing facility. Moreover, pursuant to the Management Agreement UST had contracted with CSG, Inc. to provide the processing services, and this Court finds no language in the Management Agreement that would prevent CSG, Inc. from hiring a third party, such as General Road Trucking Corp. dlb/a Coventry Sand and Gravel, to perform or assist in this function.
[5] The Court finds that CSG, Inc. received sixty-three hundred and two (6, 302) tons of contaminated soil from Taraco at a price of $60.00 per ton.
[6] The Court had granted UST summary judgment against CSG, Inc. for this breach of the Management Agreement. UST's damages for this breach are equal to $151,248.00 (40% of $378,120.00). Moreover, at the time of this breach, the uncontroverted evidence is that UST owed CSG, Inc. $47,000.00 for its share of revenue collected by UST and not disbursed to Coventry Sand Gravel, Inc.